[Crim. No. 2270. In Bank.—March 17, 1920.]

# THE PEOPLE, Respondent, v. RULIA SINGH, Appellant.

[1] CRIMINAL LAW—MURDER—THREATS—CONFLICT OF EVIDENCE—APPEAL.—In a prosecution for murder, where a number of witnesses testified to threats made by the defendant against the life of the deceased, and the defendant denied that he ever made such threats, the appellate court must presume in favor of the verdict that the jury resolved the evidence against the defendant.

[2] ID.—DYING DECLARATIONS—SUFFICIENCY OF EVIDENCE—APPEAL.—In a prosecution for murder, it must be presumed on appeal that the jury not only were satisfied that dying declarations were made in view of death, but that they represented the primary knowledge and not the opinion of the deceased, where it was not disputed that deceased realized that he was mortally wounded, and the evidence was such that the jury might well have concluded that the deceased recognized the defendant in the darkness by the outline of his figure, the sound of his voice, or some other circumstances.

[3] ID.—ALIBI—CONFLICT OF EVIDENCE—APPEAL.—In a prosecution for murder, where the evidence is conflicting as to the defense of alibi, it must be presumed on appeal that it was resolved against the defendant.

[4] ID.—DYING DECLARATIONS—RELATIVE FUNCTIONS OF COURT AND JURY.—It is the function of the trial court primarily to pass upon the admissibility of alleged dying declarations and of the jury to determine whether they were in fact made under a sense of impending death, and, if so, then to determine the credibility and weight to which they are entitled.

[5] ID.—CONSIDERATION OF DYING DECLARATIONS BY JURY.—If the jury is not convinced beyond a reasonable doubt that the declarant was *in extremis* and believed at the time that he was, they must, in arriving at their verdict, disregard such declarations, but, if satisfied beyond a reasonable doubt that the declarant acted under a sense of impending death, they must then determine what facts, if any, are established by his declarations and apply them accordingly.

---

1. Admissibility of evidence of threats in prosecutions for homicide, notes, 89 Am. St. Rep. 692; 3 L. R. A. (N. S.) 523.

2. Dying declarations as evidence, note, 56 L. R. A. 353.

4. Right of jury to determine existence of facts essential to the admissibility of dying declarations, notes, 56 L. R. A. 434; 16 L. R. A. (N. S.) 660.

[6] ID.—INSTRUCTION—DYING DECLARATION—ACCEPTANCE AS CORRECT STATEMENT.—In a prosecution for murder, an instruction that the jury had the right, in considering whether they should accept a dying declaration as "a correct statement," to determine for themselves whether the declaration was made under a sense of impending death, is not susceptible of the interpretation that if the jury found the deceased to have had a sense of impending death at the time of his declaration, he was making a correct statement.

[7] ID.—DISREGARD OF DYING DECLARATIONS — INSTRUCTION. — In a prosecution for murder, an instruction that the jury were "at liberty" to disregard dying declarations if not satisfied that they were made under a sense of impending death was not misleading, in not instructing them that they must disregard the declarations in such a case, where by the instruction immediately following they were told they should consider the declarations if satisfied beyond a reasonable doubt they were made under a sense of impending death.

[8] ID.—STATEMENTS OF DECEASED—ADMISSION "ON THEORY" OF DYING DECLARATIONS—INSTRUCTION.—In a prosecution for murder, an instruction that certain statements made by the deceased had been admitted *on the theory* that they were dying declarations was not an invasion of the province of the jury, in view of the italicized language.

[9] ID.—ADMISSIBILITY OF DYING DECLARATIONS—PRELIMINARY PROOF. Where, in a prosecution for murder, there was considerable foundation testimony indicating the settled conviction of pending dissolution, there was no error in not determining by means of preliminary proof addressed to the court alone the question of the admissibility of dying declarations.

[10] ID.—EVIDENCE—REBUTTAL OF ALIBI—PART OF CASE IN CHIEF.— In a prosecution for murder, the admission as part of the prosecution's case in chief of testimony responsive to the theory that the defendant had fabricated an alibi was not erroneous, since the state was not required to defer its attack until evidence in support of the alibi was first introduced, and in view of the fact that the whereabouts of the defendant at the time of the murder was indispensable to the case of the prosecution in chief.

[11] ID.—EVIDENCE—REBUTTAL OF PRESUMPTION OF INNOCENCE—CASE IN CHIEF.—Any competent evidence which tends to rebut the presumption of innocence is always admissible as part of the prosecution's case in chief.

[12] ID.—THREATS OF DEFENDANT—INCLUSION OF OTHERS THAN DECEASED—ADMISSIBILITY.—In a prosecution for murder, there is no error in admitting testimony of threats of defendant although

they involved an intention to kill other persons as well as the deceased.

[13] ID.—REFUSAL TO STRIKE NONRESPONSIVE ANSWER—WHEN HARM-LESS.—The refusal to strike out an answer claimed to be not responsive is harmless where testimony to the same effect had already been admitted without objection.

[14] ID.—STATEMENTS OF DECEASED TO WIFE—ADMISSIBILITY AS DY-ING DECLARATIONS—INADMISSIBILITY AS PART OF RES GESTAE.— In a prosecution for murder, where statements made by the deceased to his wife are admissible as dying declarations, it becomes 'immaterial' whether they were a part of the *res gestae*.

[15] APPEAL—ERRORS IN RULINGS ON EVIDENCE—SUFFICIENCY OF AS-SIGNMENT.—Objections to questions, rulings, motions to strike out and answers given are not entitled to be considered on appeal where no reasons are assigned or authorities cited, other than the bare statement that the "court erred."

[16] CRIMINAL LAW—MURDER—EVIDENCE—STATEMENT OF DEFENDANT— SELF-SERVING DECLARATION.—In a prosecution for murder, where the prosecution claimed that the alibi of the defendant was fabricated by his going to a hospital, an alleged statement made by the defendant while in the hospital to a witness for the defense as to how he was feeling was properly excluded as a self-serving declaration.

[17] ID.—INCONSISTENT STATEMENTS OF WIFE OF DECEASED—DYING DECLARATIONS—HEARSAY.—In a prosecution for murder, evidence of former inconsistent statements of the wife of the deceased as to his dying declarations did not constitute independent evidence which did not require any foundation proof, but was clearly hearsay.

[18] ID.—EVIDENCE—IMPEACHMENT OF WITNESS—INCONSISTENT STATE-MENTS.—Before the statements of a witness inconsistent with his present testimony may be shown, the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and, if so, allowed to explain them.

[19] EVIDENCE — MATERIALITY OF QUESTION — DUTY TO REFRAME. — Where a question does not show on its face whether or not it is material, the questioner, in order to reserve an exception, must formally reframe the question so that its materiality is· apparent.

[20] CRIMINAL LAW—MURDER—EVIDENCE—POSSESSION OF PISTOL.—In a prosecution for murder, testimony of the wife of the defendant that he kept a pistol at the head of his bed was too remote, but its admission harmless where the defendant admitted that he did so keep a pistol, but that it belonged to his partner, and his statement was not questioned.

[21] Husband and Wife—Competency to Testify Against Each Other.—The rule of the common law that the wife was absolutely incompetent to testify against her husband has been modified in this state so that either spouse may testify with the consent of the other, which may be express or implied.

[22] Id.—Competency of Wife—Presentation of Objection—Sufficiency of Grounds.—The question of the competency of the wife to testify is not sufficiently presented by an objection on the grounds of incompetency, irrelevancy, and immateriality.

[23] Id.—Competency of Witnesses—Objection in Trial Court—Appeal.—If objections to the competency of witnesses are not made in the trial court they will not be considered on appeal.

[24] Id.—Husband and Wife—Incompetency as Witness—Time of Objection.—If one spouse, a party to the action and present in court, relies upon the incompetency of the other to testify, the objection must be made at the time and on such grounds as to bring clearly before the court the question of the incompetency of the witness, or, if this is not done, the privilege will be deemed to have been waived.

APPEAL from a judgment of the Superior Court of Imperial County, and from an order denying a new trial. Franklin J. Cole, Judge. Affirmed.

The facts are stated in the opinion of the court.

O. V. Willson for Appellant.

U. S. Webb, Attorney-General, Joseph L. Lewinsohn, Deputy Attorney-General, and Jerry H. Powell for Respondent.

LAWLOR, J.—This is an appeal taken by the defendant from a judgment of conviction of murder of the first degree after a verdict fixing the punishment at imprisonment for life. The defendant also appeals from an order denying his motion for a new trial.

It was charged in the information that on November 21, 1918, in the county of Imperial, the defendant killed and murdered one Albert Joe. The defendant and the deceased were Hindus. The deceased was sometimes called "Joe Albert" and "Alberto," and the defendant is also referred to by the Christian name of "Raoul." The deceased was the husband of Alejandrina Cardenaz and the defendant of

Valentina Alvarez, her mother. The wives are Mexicans. At the time of the marriage of Alejandrina Cardenaz to the deceased in November, 1917, Valentina Alvarez had three other daughters, Romana, Andria, and Anna Maria, who made their home with her and the defendant on a ranch some six or seven miles northwest of the town of Holtville. The deceased lived with his wife and their baby on a ranch about the same distance in a southeasterly direction from the said town. Gajan Singh was the brother of the deceased and lived in a house about one mile from the latter's ranch. Following the marriage between the deceased and Alejandrina, sometimes known as "Mrs. Albert Joe," trouble arose between the defendant and his wife. The latter, explaining why she left him, said: "I had good reasons to separate from him. . . . First, he didn't give me enough for my family. . . . Secondary, he was very quarrelsome, always mad at me all the time. . . . He saw when I was telephoning, and he told me to stop and not to telephone any more, that he would send me to 'Chingada,' . . . and then he grabbed me by the hair and threw me on the floor. . . . The main reason of the quarrel was that I wouldn't give my consent for his partner to marry my daughter, Romana. . . . He told me that bye and bye we would remember him, that he was going to kill Alberto. . . . He did drive me away, he drove me away. . . . I went because he drove me from the house, he said he didn't want me in the house any more."

According to the evidence, in the month of May, 1918, the wife telephoned Mrs. Albert Joe to come out to the ranch and take her away. The deceased and his wife went out to the Rulia Singh place and, after some loud words in Hindustani had passed between the men, and the defendant had said to his wife, "You go with your daughter, and some day your daughter will think of me," they brought Valentina Alvarez and her three daughters in Albert Joe's automobile to the latter's ranch. Two weeks later, Valentina, Romana, Andria, and Anna Maria went to San Diego, where they remained until the death of Albert Joe, the defendant making two visits to that city with the object of inducing his wife to return to him, which she declined to do. The separation of the defendant and his wife, and her refusal to return to him, apparently caused bad feeling on

the part of the defendant toward the deceased and his wife, for several Hindus and the Mexican women testified to threats made by Rulia Singh against the life of Albert Joe on various occasions. These threats, according to the prosecution, culminated in the assassination of the deceased. It is conceded that the deceased died from the effects of a 38-caliber bullet fired into his body, but whether from a revolver or a rifle does not appear.

In order more fully to understand the points urged as grounds for reversal we shall set forth the evidence somewhat in detail. On the afternoon of November 21, 1918, the deceased and his wife were in the town of Holtville on business. The evidence is not clear as to the exact hour, but it was late in the afternoon when they returned to their ranch in their automobile. When they arrived they stopped for a little while, put some provisions in the automobile, and then went on to the house of his brother, Gajan Singh, where they milked the cows. They then returned home and he and his wife sat down to supper.

The deceased and his wife lived in two "tent-houses," each containing only one room. One was used as a "parlor" and the other as a "kitchen." About 150 feet south of the "kitchen" and about eighty or ninety feet from the highway was a small milk-house containing a cream separator. This was a frame building about ten feet square, and excepting for three feet at the base the walls were made of wire screen.

The wife testified that while they were eating their dog commenced a loud barking very close to the kitchen and that, "My husband came out and called him and he came in and I gave him his supper and then he went off again. . . . He barked a great deal. I was in the house and did not notice which way he went. . . . He barked all around there by the milk-house."

After supper the deceased went out to operate the cream separator. At the same time his wife started to fill and light the oil lamps in the tents. According to her testimony the dog's barking was still audible at a distance. The night was dark; there was no moon; a lighted lantern hung in the milk-house. From the spot where the deceased was found in the milk-house immediately after the shot was fired, the location of the cream separator, a hole made by

the bullet in the screen four and one-half feet from the floor, a scar made by the bullet on the wooden handle of the separator, and minor wounds in the thumb and finger of one of Albert Joe's hands, it may be assumed that at the time he was shot he was standing, facing south, turning the machine. The bullet came through the wire screen on the south side of the milk-house, and footprints were found the night of the shooting leading to and away from a point about eight or ten feet south of the house, in a direct line with the bullet hole in the screen and the scar on the handle of the separator.

About fifteen minutes after the deceased had gone out to the milk-house, as his wife was re-entering the kitchen carrying the second lamp, which she had just filled, she heard the only shot that was fired. She immediately rushed into the kitchen, lighted the lamp, and then ran over to the milk-house, where she found her husband on the floor, suffering from a gunshot wound in his abdomen. She testified that while she was running toward the milk-house she heard her husband cry out, "Raoul has killed me, Raoul has killed me." On cross-examination she said that his exclamation was, "Raoul is killing me, Raoul is killing me." She testified further that when she reached her husband she asked him if he had seen Raoul Singh, and that he replied, "Yes," and that Raoul Singh had said, "Now, you son-of-a-b——h, you remember what I told you. You would not let Valentina come with me, and now see what you got." Questioned further, her version of this latter statement of the deceased was, "You son-of-a-b——h, why didn't you let Valentina come to my house?"

The wife placed the deceased in a small milk-cart and wheeled him over to the ranch-house. She testified that as she was crossing the fifty yards between the milk-house and the kitchen she heard the dog barking to the north of the tent-houses, and, from the same direction, the sound of buggy wheels on the Holtville road. After leaving her husband lying on the floor, inside the ranch-house, she took her baby and ran about one-quarter of a mile to the dairy of a neighbor, Manuel Magruda, who promised to telephone for a doctor, and then hurried to the house of Gajan Singh, her brother-in-law. The latter accompanied her back to the Albert Joe ranch.

As the result of a telephone call, Dr. H. B. Graeser arrived about twenty minutes later and made an examination of the injured man. The physician questioned Albert Joe as to who shot him. The deceased answered, "Rulia Singh shot me." In response to another question, "How do you know Rulia Singh shot you—did you see him?" his reply was, "No." Later, C. L. Gillett, city marshal of Holtville, Dr. David A. Stevens, and A. R. Underwood, a constable, appeared on the scene. They were followed by Under-sheriff H. L. Barker and Deputy Sheriff J. L. Ridgway. Dr. Stevens testified that as he came into the room where the dying man lay, the first words he heard were those of Dr. Graeser "telling him [the deceased] that he was a goner and he was dying." Dr. Stevens and Dr. Graeser then held a consultation in the presence and hearing of the deceased, during which Dr. Graeser remarked to Dr. Stevens, referring to the deceased, "that he was a goner." Dr. Stevens then examined Albert Joe and told him that he was going to die. In response to this the wounded man said, "Rulia Singh killed me." The following is the substance of what passed between Dr. Stevens and Albert Joe. When the doctor inquired why Albert Joe thought that the defendant had shot him and what reason Rulia Singh would have, he replied that it was a long story. Again, the doctor suggested to Albert Joe that it could not have been the defendant because he had been put in the hospital at 2 o'clock that afternoon. The injured man reiterated that the defendant had killed him. The under-sheriff asked Albert Joe who shot him and he replied, "Rulia Singh. He is my only enemy. All men are my friends." To similar questions by the city marshal Albert Joe declared that the defendant shot him. His words were, "Mr. Charlie, it is a long story. I cannot tell you; I am going to die pretty soon, but I know Rulia Singh killed me."

After a consultation between the physicians, Dr. Graeser, the city marshal, Gajan Singh, and Mrs. Albert Joe took the injured man to Holtville in an automobile. Stopping in front of the Holtville Hospital, Gajan Singh detailed the following conversation with Albert Joe: "After he stopped the machine, I said, 'Brother dear, so you no live, you have got to be die, you better talk now. After he start the machine to go to El Centro, maybe too far; maybe you talk again

and maybe not talk again.' . . . He say, 'Rulia Singh shot me, at the same time he shot, he talk bad talk. He says son-of-a . . . at the same time he started to shoot. . . . Rulia Singh said son . . . and knock me down.' . . . I said, 'You tell me all you got, everything of your business.' He say, 'I buy bull, a little one, and I no pay; he got paper, notes. . . . Anybody got my signature, I have notes and everything; some Hindu he take five, ten dollars, maybe give Albert Joe note, you give it note. See. Anybody got notepaper of any kind of me you pay. Pay everybody got my papers. You watch my baby, you look after my baby.' Me cry and me no say nothing and he talk, talk, and that is all. . . . Yes, sir, he told me sure, 'I got bad place, I die, I die,' he say 'die.' '' The party then left for the hospital in El Centro, but the deceased died on the way about midnight. Dr. Stevens, the under-sheriff and the deputy sheriff went in an automobile to the Holtville Hospital, on the first floor of which Dr. Stevens had his office, to see the defendant, who had gone there in the afternoon. The party arrived about midnight.

The trial lasted eight days, and many witnesses, mostly Hindus and Mexicans, were examined. In support of its claim that the defendant committed the murder, the prosecution assigned as the motive for the crime the grudge which he conceived against Albert Joe when Valentina Alvarez left his ranch and refused to return to him, and that this motive was made evident by the conduct of Rulia Singh toward Albert Joe, and especially by his repeated threats against the life of the deceased. The defense relied upon two main contentions as to the evidence—that the prosecution failed to prove the defendant guilty, and that, on the other hand, his alibi established his innocence.

There is much evidence of threats against Albert Joe in addition to the one made by defendant at his ranch the day his wife left. Mrs. Albert Joe testified that two days after the separation the defendant came to the Albert Joe ranch and said to her: "Alejandrina, you tell your mother to come back to my house, and if you don't, I will kill Joe Albert." According to this testimony, he also said, "You tell your mother if she don't return to my house I will kill Alberto." Mrs. Albert Joe stated further that defendant made a second visit to the Albert Joe ranch two months

CLXXXII Cal.—30

later and asked her for the address of his wife, who at that time was in San Diego, and that "he got very mad at my husband. They used to talk very angrily."

Valentina Alvarez and her daughter, Romana, testified that defendant had a pistol, which he kept at the head of his bed. They also corroborated the testimony of Alejandrina as to the threats made by the defendant on the occasion of his first visit to the Albert Joe ranch after his wife left him. According to the testimony of his wife, when the defendant visited her in San Diego for the first time, he asked her to go out with him and when she declined, "He told me to go to hell, . . . that I would remember him, that there would be no more Captain Alberto." When he saw her for the second and last time in San Diego, he told her, ". . . bye and bye there would be no more Alejandrina, and no more Albert Joe, that it didn't make any difference, he would kill them all."

The daughter, Romana, testified that the defendant spent at least two days in San Diego on the occasion of his second visit to his wife in that city, that she, Romana, saw him on the second day of his visit, and that he then told her and her mother "he didn't give up hope of killing Albert Joe."

One Lav Singh testified that in a conversation with the defendant, about twenty days before the murder, the latter said, "I am going to kill Albert Joe; he took my wife; she wants to come home and he won't let her come home."

Sher Singh, husband of a sister of the defendant's wife, testified to four conversations with the defendant between the time that the latter's wife left him and the date of the murder. About twenty days or one month after defendant's wife had gone to the Albert Joe ranch, he visited the witness and his wife at their ranch in Imperial County and suggested that perhaps Sher Singh's wife could get her sister to come back to him. Ten or fifteen days later the witness met the defendant on the street in Holtville, and on this occasion the defendant said, "Joe Albert took my wife, and I am going to kill him." Again, on meeting the witness on the street in Holtville about two weeks later, the defendant said, referring to the deceased, "I am going to kill him." In the course of a fourth conversation, subsequently held with the defendant in front of the cotton-

gin in Holtville, Rulia Singh said to the witness, "I am going to kill him. If I can get somebody, I can spend four or five hundred dollars to try and have him killed by somebody; I will spend four or five hundred dollars."

Rul Singh, Chet Singh, and Deva Singh all testified to the substance of a conversation between the three and Rulia Singh near the courthouse in Holtville in the month of October, 1918. Rul Singh stated that the defendant "abused to Albert Joe," and said, referring to the deceased, "He is my son-in-law and I am his father-in-law, and I will see him some time. . . . I am not going to settle up." The testimony, in part, of Deva Singh is as follows: "Rul Singh say, 'You and Albert Joe pretty mad, . . . you had better settle up.' Rulia says, 'I cannot settle with him, I no want him, I want to kill him,' and he talked more to him about it and he was pretty mad. After, I talk to Rulia Singh, I say, 'You and Joe pretty bad mad, and that is no right, you had better settle up, and I go with you, and take some more men.' Rulia Singh say to me, 'He cannot settle with me, I no want him, and he no want me,' he says, 'I fix him pretty soon, you see.' " Chet Singh testified that, in the course of the conversation last mentioned, Rul Singh urged the defendant to "shake hands and be friends hereafter," and Rulia Singh replied, "Should I shake my hands with him? I am going to kill him."

Sunder Singh testified that about 3 o'clock on the day of the killing Rulia Singh came to his ranch, about six miles north of Holtville, in an automobile and held a conversation with the witness, in the course of which he said, "I will kill that Abert Joe, the son . . . ; I no want him at all to keep my wife on the place."

Appellant's position with respect to his alibi is thus stated in his brief: "The appellant and his witnesses gave evidence . . . that . . . the defendant had been ill at his ranch of influenza, treating himself and without the services of a physician during the ten days preceding the day and the night of the shooting, and that in the fore part of the afternoon of November 21, 1918, the appellant had come from his ranch . . . to Dr. David A. Stevens, . . . who examined him . . . and directed him to a hospital in the business district of Holtville, where the appellant went about 2 o'clock in the afternoon . . . and in which hospital . . . he

stayed until he was taken out under arrest the next day by one of the officers.''

The first witness called in support of the alibi was Mrs. Anna Miller, a graduate nurse, in charge of the Holtville hospital. She testified on direct examination that on November 21, 1918, about 1:30 P. M., the defendant, accompanied by one T. D. Sherm, applied for admission to the hospital; that the defendant said he was convalescing from la grippe; that he was assigned a room, undressed, and put to bed, and that his temperature was taken and noted on a chart made for that purpose; that at that time there were in the hospital two other patients—one of them a Hindu, Neer Singh, very seriously ill, who died less than two days later; that the defendant was given lunch that day and some medicine about 3 o'clock in the afternoon after the doctor had called and prescribed for the patient; that either she or her husband took the defendant's temperature at 3 P. M., and recorded it on the chart at the time; that about 5 P. M., while she was ministering to a patient across the hall, ''I seen a Hindu passing from this Neer Singh's room and I looked in and saw Rulia Singh in bed''; that about half-past 5, ''Rulia Singh came through the hall and inquired where the toilet was''; that Dr. Graeser, who was attending another patient, showed him the toilet, and that shortly after she saw defendant return to his room; that her husband took supper to the defendant about 6 o'clock; that she saw the defendant again at 7 o'clock; that she and a Mrs. Ramsay saw the defendant in bed at 9 o'clock, ''his regular medicine time''; and that about half-past 11, when she was called by City Marshal Gillett, she went up to the defendant's room and saw him in bed. On cross-examination she said that it was between 1 and 2 o'clock when the defendant first came to the hospital; that she was ''pretty nearly'' sure that she made a record of his temperature on the chart at the time she took it; that Dr. Stevens came in between 2 and 3 o'clock and left a prescription for the defendant; that she was not positive where the doctor left the prescription; that she ''thought'' she and her husband had the prescription filled by 3 o'clock; that she was ''quite positive'' that the first medicine was given the defendant about 3 o'clock, but, when further pressed on the subject,

admitted that she didn't remember; that she "thought" she
gave the defendant medicine at 6 o'clock—"At 6 o'clock he
had a—I guess he had the medicine again"; that she did
not see Rulia Singh asleep at any time while he was in the
hospital; that "Rulia Singh didn't have any temperature
when he came in. His temperature was 99; he wasn't
sick"; that she didn't *see* Rulia Singh come out of the toilet
to which he was shown by Dr. Graeser at half-past 5, but
that she didn't think he went out of the building; "I heard
Rulia Singh coming back to his room with his shoes unlaced
—I suppose it was him; his shoes was unlaced and they
were making a noise on the carpet as he walked along."
When further questioned, she was not so positive as to
whether she or her husband administered the medicine. The
above-mentioned chart was introduced in evidence and Mrs.
Miller admitted that the entries thereon did not correspond
with her visits to the defendant to which she had just testi-
fied; but accounted for the discrepancy with the statement
that "We were short of help and we didn't keep our rec-
ords." She further stated that Rulia Singh didn't seem to
need much attention; admitted that she and her husband
were in the habit of writing down the various items on the
chart whenever they had an opportunity to do so and not
necessarily at the time indicated; and said that she couldn't
remember whether, at the time Dr. Stevens arrived at the
hospital, about 11 o'clock the night of the shooting, the en-
tries then appeared on the chart or were added sub-
sequently. She admitted that when Under-sheriff Barker
and Deputy Sheriff D. J. Matlock called on her a few days
after the murder to get the hospital chart, she told them
that she had not seen the defendant between 6 and 9 on
the night of November 21, 1918, and that she made the same
statement to the district attorney, Under-sheriff Barker, and
a stenographer when they called at her house during the
month of December, 1918. On this latter occasion she also
said that when, about 5:30 P. M., the defendant came out
of his room, as she had already stated, he was dressed; that
"he could have gone out easy enough as there was a sick
Hindu man in the next room and the Hindus kept coming
up to see him in bunches of two and three all afternoon
and the early part of the night, so you see he could have
gone out and come back with some of them and we would

never have known the difference. . . . He could have done it easy. . . . He was always awake.''

Under-sheriff Barker testified that when he saw the chart in the hospital at midnight on November 21, 1918, the only entries appearing thereon were those of the defendant's temperature and pulse, taken when he was admitted to the hospital on that day. Dr. Graeser testified that his ''recollection'' was that the Hindu to whom he showed the toilet was fully dressed.

Mrs. Miller's husband, Delos M. Miller, a carpenter by trade, testified that on the afternoon the defendant was admitted to the hospital he was assisting his wife; that he saw the defendant in bed at 3 o'clock and again at 6 o'clock, when he took him his supper; that he couldn't remember whether he or his wife gave the defendant his medicine; that he didn't see the defendant go out of the hospital that afternoon, but that he might have left the building while the witness was in one of the other wards; that he ''thought'' he took the pulse or temperature of the defendant at various times during the afternoon and early evening. On cross-examination he said that he didn't think the defendant had any medicine between 6 and 9 o'clock; that it was possible that Rulia Singh had passed out of the hospital after 6 o'clock and then slipped back before 9 o'clock; that there was a door from the defendant's room out on to the roof of Dr. Stevens' office, from which descent to the ground was practicable by means of a ladder placed on the east side of the building.

Basant Singh testified that at 6 o'clock on the evening of the shooting, accompanied by Jewn Singh, he went to the hospital to visit his brother, Neer Singh; that while there they made one visit to the defendant in the latter's room; that they remained in defendant's room about five minutes; that, according to Jewn Singh's watch, it was 7:25 P. M. when they left; and that the witness ''went about twenty times to the hospital that day because he [Neer Singh] was so sick and on the point of death.''

Jewn Singh testified that he went to the hospital that day with Basant Singh; that he heard Rulia Singh coughing and went into his room and talked with him about five minutes; that he saw by his watch in the stairway of the hospital as he was leaving that it was 7:25 P. M. On cross-

examination he stated that Rulia Singh looked "pretty pale" and coughed a great deal; that the reason why he entered defendant's room was because he heard him coughing and saw that he was a fellow-countryman.

The defendant took the stand in his own behalf and testified that for ten days before he applied for admission to the hospital he had been suffering from influenza and had been treating himself with lemon and whisky without the care of a physician; that he arrived at the hospital about 2 in the afternoon and went "right to bed"; that Mrs. Miller gave him some medicine shortly after he arrived and that Mr. Miller brought him supper; that he was shown to the toilet by a man whom he could not identify; that after supper— how long after he could not remember—Mrs. Miller gave him some medicine; that he slept all the time and had to be awakened to take his medicine; and that Basant Singh and Jewn Singh were in his room "from 7 to half-past 7, or quarter to 7, somewhere there. I don't know for sure but they know. . . . I guess it was 7 or a quarter after 7. I don't know any time. . . . I don't know how long after supper the time that Basant Singh and Jewn Singh left." On cross-examination he said that he was "very sick" the day he went to the hospital; that for eight or nine days preceding that time he had been ill and had not left his ranch; that he was out in his automobile the morning of the murder "seeing about some corn-cutters"; that he did not know what time it was when he had his supper.

Sun Singh, who was examined by the prosecution in rebuttal, testified that he saw Jewn Singh in the town of Imperial at 5 P. M. on the day of the murder and that from that time on they spent the evening and night together "in a colored man's hotel" in that town.

Sunder Singh, recalled in rebuttal by the prosecution, testified that at half-past 6 on the evening of November 21, 1918, Basant Singh came to the witness' ranch from Holtville bringing some groceries, which the witness had asked him to get that morning, and that he took supper and went home "about 7 o'clock, maybe a little over." According to Basant Singh's testimony, he was in the hospital at Holtville from 6 to 7:25 P. M.

Bertha Gonzales, who lived with her husband on the defendant's place, and Alisa Comfort, cook on the same ranch,

both testified that the defendant was sick for a period of a week or ten days preceding the day of the murder, during which time he did no work and dosed himself with lemon and whisky.

Hira Singh, defendant's partner, corroborated this testimony and said that defendant told him about noon on the day of the shooting that he was going to the hospital in Holtville.

Hockum Deen and Noor Mohammed, called for the prosecution, testified that they were in Holtville the afternoon of November 21, 1918, and that at half-past 4 they saw Rulia Singh "standing and hiding" by a lamp-post on the street near the bank.

Mrs. Albert Joe testified that on the day of the murder, while she was sitting in their automobile on the street in Holtville, waiting for her husband, Rulia Singh "passed two or three times and I think it was about half-past 4."

Dr. Stevens testified that the defendant came into his office about 2 o'clock that day; that he was accompanied by one T. D. Sherm, a well-dressed Hindu, speaking good English. "He came in and said he wanted to go into the hospital and stay about a week. He said he just wanted to pick up or something of that kind. . . . I took his pulse and temperature. . . . There was a normal pulse rate and a normal temperature. . . . There was nothing the matter with him that I could discover. I prescribed a simple tonic for him, just a simple tonic to be given every three hours." He stated further that he did not see the defendant again until midnight, at which time he was accompanied by Under-sheriff Barker and Deputy Sheriff Ridgway. They found the defendant in bed with the covers over his head. This witness testified that there was a ladder on the east side of the hospital building, leaning against the roof thereof. County Physician T. O. Luckett testified that he examined the defendant in the county jail the day after the killing, and continued: "I examined his throat and found it normal. I took his temperature and it was normal, and his pulse was normal, and I decided there was nothing wrong with him."

The defendant testified further that Albert Joe was not the cause of the separation. "I told Albert Joe myself to take her to visit. I think it was my wife's fault and not

Albert Joe's at all; I had no trouble whatever with him";
that when the deceased and Alcjandrina came to take his
wife away he was "cleaning the ditch in the river," and
that he and the deceased were friendly and laughed to-
gether; that he did not drag his wife around by the hair;
that when she left him she "kissed and hugged" him and
told him to come and see her in two or three days at Albert
Joe's house, and that he gave her one hundred dollars in
cash; that on the occasion of his first visit to his wife in
San Diego she told him, "I will be back as soon as the
summer-time will pass"; that he then gave her $65 more—
all he had at the time; that about July 4th he learned that
she was not coming back to live with him, when he saw her
in San Diego the second time, "walking in the street with
another man, holding their arm in each other." The de-
fendant denied that he ever told anyone that Albert Joe
was keeping his wife away from him, that he was going to
kill Albert Joe, or that he owned a pistol, but said that he
kept one belonging to his partner in the house.

We think the foregoing summary of the testimony is suffi-
cient upon which to determine whether or not, upon the
question of the guilt or innocence of the defendant, his convic-
tion can be upheld. One of the grounds stated in the motion
for a new trial is that the verdict is contrary to the evi-
dence. On appeal it is urged that the defendant was not
identified by the deceased as the murderer and that the
alibi was clearly established. The evidence upon the three
principal questions—the threats, the dying declarations, and
the alibi—is involved throughout in conflict. [1] As al-
ready shown, a number of witnesses testified to threats
made by the defendant against the life of Albert Joe, and
the defendant denied that he ever made such threats. Upon
this evidence the jury could have found that the defendant
threatened the life of Albert Joe, and on this question we
must presume in favor of the verdict that the jury so re-
solved the evidence.

[2] It must likewise be presumed that the jury not only
were satisfied that the dying declarations were made in view
of death, but that they represented the primary knowledge
and not the opinion of the deceased. There is an abundance
of evidence to support the implied finding of the jury that
Albert Joe from the beginning realized that he was mortally

wounded. Indeed, as is hereafter shown, this is not disputed. The jury might well have concluded from the evidence, notwithstanding that it was a moonless night, that Albert Joe recognized the defendant at the time by the outline of his figure, the sound of his voice, or by some other circumstance or condition of which the men themselves had knowledge and the existence of which does not seem to be precluded by the record. Whether the dying declarations represented the primary knowledge of Albert Joe or merely his opinion as to the identity of his assassin was purely a question of fact for the jury to determine. "Where . . . want of knowledge does not appear either from the statement itself or from other evidence in the case, it must be presumed that the declarant stated a fact within his knowledge." (21 Cyc. 989; *State* v. *Arnold,* 35 N. C. 184; *State* v. *Williams,* 67 N. C. 12; *State* v. *Clemons,* 51 Iowa, 274, [1 N. W. 546] ; *Walker* v. *State,* 39 Ark. 221.) In the state of the evidence, we would be invading the province of the jury if we held that Albert Joe did not recognize the defendant from impressions received through his senses, and that in crying out to his wife, "Raoul is killing me," he was not speaking from knowledge, but was voicing an opinion—based either on the threats of the defendant or on his expressed animosity and enmity.

[3] Nor are we prepared to hold that the implied rejection by the jury of defendant's alibi is not amply supported by the evidence. It will be recalled that Delos M. Miller testified that the defendant might have left the hospital after 6 and then slipped back before 9 o'clock without having been seen by him. His wife stated that she saw the defendant at 7 and did not see him again until 9 o'clock. She admitted that at the preliminary examination she had stated that the defendand could have absented himself from the hospital between the hours of 6 and 9 o'clock. When confronted with Basant Singh and Jewn Singh her testimony seems to indicate that she had seen both men in the defendant's room, and when asked "what time they came to see Neer Singh that evening," she replied, "I cannot give you any definite answer to that." Even if the jury found that this testimony was entitled to full credit, there would be, according to the husband, three, and according to the wife, two hours in which the defendant might have made the round trip to the Albert Joe ranch

and committed the murder. The evidence does not show the exact time the shot was fired. However, appellant's brief states that it was about 8 o'clock, and the jury may have found this to be correct. City Marshal C. L. Gillett testified that he received news of the tragedy by a telephone message from Gajan Singh about ten or fifteen minutes to 9. This would allow forty-five or fifty minutes for Mrs. Albert Joe to accomplish all she testified she did following the shooting, which included getting word to the authorities. Can we hold, in the face of the foregoing testimony, that the jury would not be justified in finding, in accordance with the theory of the prosecution—asserted from the beginning—that the defendant went in to the hospital for the purpose of laying a foundation for his alibi, that he slipped out, went to the Albert Joe ranch, committed the murder, and returned to the hospital without his having been missed? We think not. If the jury believed that Rulia Singh went in to the hospital with this object in view, more convincing evidence of a deliberate and premeditated intention to commit murder it would be difficult to conceive. It is urged, however, that according to the testimony of Basant Singh and Jewn Singh, they were in the defendant's room at 7:25 P. M. On this question of time, as his quoted testimony shows, the defendant was not as definite. But, assuming that there is agreement between the three as to the hour of 7:25 P. M., yet there was before the jury the counter-testimony of Sun Singh and Sunder Singh as to the whereabouts of Basant Singh and Jewn Singh, respectively, on that evening, and in the presence of such a conflict in the evidence we must presume, in the light of the verdict, that it was resolved by the jury against the defendant.

Finally, on the sufficiency of the evidence, it may be mentioned that it is also objected by appellant that the testimony of the comparative size and shape of the footprints near the milk-house was incomplete and unconvincing. According to the testimony, the shoes worn by the defendant were square-toed and the footprints were of similar outline, but there was an apparent disparity in the sizes. It seems to us the objection was well-founded, but we are not inclined to believe that the jury considered the testimony in arriving at the verdict. And for that reason, as well as for the reasons hereinafter stated, we shall not discuss assign-

ments of error Nos. 9 and 10 as to the rulings in the admission of this testimony.

The appellant relies for reversal upon a number of assignments of error. The first assignment is based upon those portions of the following instruction to the jury which we have italicized: "You have the right, in considering whether or not you shall accept the declaration *as a correct statement,* to determine for yourselves whether the declarations were made under a sense of impending death, and fully convinced of that fact when making the declarations, and *you are at liberty to disregard* the declarations, or any of them, if you are not satisfied that they were made under a sense of impending death."

Section 1870 of the Code of Civil Procedure provides, in part: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: . . . 4. . . . In criminal actions, the act or declaration of a dying person, made under a sense of impending death, respecting the cause of his death."

The weight of authority in respect to the relative functions of the court and the jury touching the admission and determination of dying declarations is that the court alone shall pass on the admissibility of this character of evidence, and that the jury shall exclusively determine its probative value. (56 L. R. A. 434; 16 L. R. A. (N. S.) 660; 52 L. R. A. (N. S.) 152; 4 Ency. of Evidence, 947.) [4] Whatever the law may be in other jurisdictions, it is well-settled in this state that it is the function of the trial court primarily to pass upon the admissibility of the alleged dying declarations and of the jury to determine whether they were in fact made under a sense of impending death, and, if so, then to determine the credibility and weight to which they are entitled. [5] If the jury is not convinced beyond a reasonable doubt that the declarant was *in extremis* and believed at the time that he was, they must, in arriving at their verdict, disregard such declarations. But if, on the other hand, the jury are satisfied beyond a reasonable doubt that the declarant acted under a sense of impending death, they must then determine what facts, if any, are established by his declarations and apply them accordingly. (*People v. Glenn,* 10 Cal. 32; *People v. Lem You,* 97 Cal. 224, [32 Pac. 11]; *People v. Thomson,* 145 Cal. 717, [79 Pac. 435];

*People* v. *Profumo,* 23 Cal. App. 376, [138 Pac. 109];
Greenleaf on Evidence, sec. 161.)

With respect to the use of the words in the instruction,
"as a correct statement," it is claimed in appellant's brief
that "this instruction led the jury to the understanding
. . . that if they . . . found the deceased to have had a
sense of impending death at the time of his declaration, he
was making *a correct statement.*" [6] We do not think
that the phrase complained of was susceptible of the inter-
pretation sought to be put upon it. The instruction was
taken from *People* v. *Thomson,* 145 Cal. 717, [79 Pac. 435],
touching the respective provinces of the court and the jury
as to whether the dying declarations were made in view of
approaching dissolution. The court said: "They have the
right, in considering whether they shall accept the declara-
tion as a correct statement, to determine for themselves
whether the declarant was *in extremis.*" In our opinion,
the jury must have understood from this instruction that in
addition to being satisfied that the declarant told the truth
they must also be convinced that he was *in extremis* at the
time.

The appellant claims that the other alleged objectionable
phrase in the instruction, "you are at liberty to disregard,"
is erroneous in that the jury were not instructed that they
*must* disregard the declaration if they found it was not
made under a sense of impending death. In support of
this contention the appellant relies upon *People* v. *Profumo,*
23 Cal. App. 376, [138 Pac. 109]. In that case the entire
instruction on dying declarations was given to the jury in
the exact language used by this court in *People* v. *Thomson,*
*supra.* The district court of appeal held the instruction to
be erroneous but that it did not constitute a miscarriage of
justice. The respondent contends that the instruction in
*People* v. *Profumo, supra,* was not erroneous, but we do not
deem it necessary to pass on that question, because the ap-
pellant, according to his brief, "did not seriously contend
that the deceased did not have a sense of impending death.
This was shown by the circumstances—what the surgeons
told the deceased and the use by the deceased of the word
'killed.'" [7] And, for another reason, any possible mis-
understanding by the jury was removed by an instruction
immediately following, "*If you are satisfied beyond a rea-*

*sonable doubt* that the declarations of Albert Joe . . . *were made by him under a sense of impending death*, then you should consider such statements and give them such weight and credit as you think they are entitled to under the circumstances of the case." We quote from *People* v. *Phillips*, 30 Cal. App. 31, [157 Pac. 1003, 1005]: "Instructions are to be read in their entirety and not by segregated and separate portions."

[8] The second assignment of error is that the trial court invaded the province of the jury in giving the following portion of instruction No. 5: "Certain statements made by the deceased, Albert Joe, have been admitted in evidence *on the theory* that they were dying declarations." The language we have italicized disposes of this objection. Moreover, this instruction was immediately followed by the one which we have considered under the first assignment of error.

[9] Assignment No. 3 is that "the court erred in not determining by means of *preliminary proof* addressed to the court alone the question as to the admissibility of the numerous purported 'dying declarations.'" This objection is without force, for the reason that there was considerable foundation testimony, including the directions of the declarant to his brother, Gajan Singh, as to the adjustment of his worldly concerns, all indicating his settled conviction of pending dissolution. (4 Ency. of Evidence, 974; *People* v. *Yokum*, 118 Cal. 437, [50 Pac. 686]; *People* v. *Abbott*, 2 Cal. Unrep. 383, [4 Pac. 769].) And, as we have noted above, the appellant concedes that the dying declarations were made in view of death.

[10] Assignments Nos. 4 and 5 are to the effect that the court erred in admitting, as a part of the case in chief, testimony having a tendency to anticipate and prejudice the alibi relied upon by Rulia Singh. We are of the opinion that this claim is without merit for several reasons. The testimony was clearly responsive to the theory of the people already referred to—that the defendant had fabricated an alibi—and hence the state was not required to defer its attack until evidence in support of the alibi was first introduced. But, apart from this, evidence of the whereabouts of Rulia Singh at the time of the murder was indispensable to the case of the prosecution in chief; and in meeting this

burden testimony in support of the people's claim that the
defendant entered the hospital as a part of his deadly
scheme would be clearly admissible either as independent
evidence of an incriminating nature or because it would
have a tendency to corroborate the identification of the de-
fendant by Albert Joe. [11] Any competent evidence
which tends to rebut the presumption of innocence is always
admissible as a part of the prosecution's case in chief. In
any event, even if it be conceded that the rulings com-
plained of involved a departure from the proper order of
proof, under the circumstances of this case the error would
not be prejudicial.

[12] Assignment No. 6 is that "the court erred in ad-
mitting testimony of threats toward persons other than the
deceased." This objection has reference to threats already
set forth, which apparently had a double import—an inten-
tion to kill Albert Joe, and thus, as a consequence, to cause
mental suffering to defendant's own wife and her children,
including Alejandrina, the wife of deceased. So far as the
women are concerned, the threats at most seemed to be an-
other phase of the threats against Albert Joe, intended by
the defendant, principally, if not entirely, to effect a re-
conciliation with his wife. But whatever the actual state of
the defendant's mind was toward the women, it was so inter-
mingled with his deadly animus toward Albert Joe—ex-
pressed on numerous occasions—that one could not be
proved without establishing the other. In such a case evi-
dence of such incidental or collateral threats will not be re-
jected. Appellant relies on 16 Corpus Juris, 545, section 1041,
which lays down the rule that "threats are relevant to show
intent and motive, provided they were directed against the
person injured." *Clinton* v. *State,* 56 Fla. 57, [47 South.
389], is there cited. In that case the defendant was being
tried for arson. Testimony was admitted of threats by the
defendant against the attorney for the prosecuting witness.
The appellate court said: "There is nothing in this testi-
mony to show that . . . the hostility against the attorney
might also include the client." The judgment was reversed,
and we think properly so, for the reason that it did not
appear that the client figured in the animus of the defend-
ant, as was the situation of the women and the deceased in
this case. At any rate, in the case at bar, in the light of the

evidence of numerous threats to kill the deceased in which the women did not figure, the admission of the threats complained of would not, even if erroneous, constitute reversible error.

[13] Assignment No. 7 relates to the refusal of the court to strike out an answer claimed not to be responsive. It is a sufficient answer to this assignment of error to point out that testimony to the same effect had already been admitted without objection.

[14] Assignment No. 8 is to the effect that the testimony of the wife of the deceased touching his statements to her at the milk-house was inadmissible as part of the *res gestae*. But inasmuch as the statements, as we have held, were admissible as dying declarations, it is immaterial whether or not they were a part of the *res gestae*.

[15] With regard to assignments Nos. 9, 10, 11, 12, 13, and 14, the appellant has set forth the questions, the objections, the rulings, the motions to strike out, and the answers, where any were given, but no reasons are assigned nor authorities cited in support of the claims of error, other than the bare statement that "the court erred." This court has, in numerous instances, declined to consider objections so presented. (*People* v. *McLean,* 135 Cal. 306, [67 Pac. 770]; *People* v. *Cebulla,* 137 Cal. 314, [70 Pac. 181]; *People* v. *Hadley,* 175 Cal. 118, [165 Pac. 442].) We have, nevertheless, examined these assignments and find that there is no merit in any of them.

[16] The record shows, with respect to assignment No. 15, that Basant Singh, a witness for the defense, in answer to the question, "Did you go in to see him?" (referring to the defendant when he was in the hospital) said, "Yes, sir. It so happened that Jewn Singh had gone to see him . . . in his room, and then I went for Jewn Singh. I also asked him [Rulia Singh] how he was feeling and he said—." An objection was interposed at this juncture on the ground that any statement made by the defendant would be a self-serving declaration. The court did not err in sustaining this objection.

It may be explained in connection with assignment No. 16 that the wife of the deceased testified, on cross-examination, that she had "never told to anybody, except to said Seymour [the special prosecutor] the statements she gave in

evidence as the dying declaration of her husband to her.''
The defendant later called City Marshal Gillett with the
view, according to the defense, of establishing by him that
while Mrs. Albert Joe at the ranch on the night of the mur-
der told him about the dying declarations, in quoting the
deceased she did not include the statement testified to by her at
the trial: ''Now, you son-of-a . . . , see what you got.'' The
pertinent part of the question put to the city marshal was:
''Will you state to the jury what your questions were and
what answers were made by her, Mrs. Albert Joe?'' The
district attorney objected that the proper foundation had
not been laid to permit such an impeachment. The objec-
tion was sustained. The following proceedings represent
the only attempt to lay a foundation for impeachment:
''Q. Did you ever tell any person before you came on the
witness-stand to-day what your husband said about, 'Now,
you son-of-a . . . , see what you got?' A. No. Q. You didn't
tell this statement at the preliminary hearing at Holtville, did
you? A. No, sir. Q. Why not? A. Because I didn't re-
member everything my husband told me. I am just remem-
bering now.''

[17] The position of the appellant is that the statements
of Mrs. Albert Joe constituted independent evidence which
did not require any foundation proof. We cannot assent
to this proposition. Considered as independent evidence,
the statements were clearly hearsay and, as such, incom-
petent and inadmissible. The only ground upon which the
statements could be received was that they tended to im-
peach the testimony of Mrs. Albert Joe, and it is not
claimed that any foundation was laid for such impeach-
ment. [18] It is the settled law in this state that before
the statements of a witness inconsistent ''with his pres-
ent testimony'' may be shown, ''the statements must be
related to him, with the circumstances of times, places, and
persons present, and he must be asked whether he made
such statements, and, if so, allowed to explain them.''
(Code Civ. Proc., sec. 2052; Birch v. Hale, 99 Cal. 299, [33
Pac. 1088]; Rowe v. Hibernia Sav. etc. Soc., 134 Cal. 403,
[66 Pac. 569]; Sinkler v. Siljan, 136 Cal. 356, [68 Pac.
1024]; People v. Glover, 141 Cal. 233, 246, [74 Pac. 745]; Mut-
ter v. I. X. L. Lime Co., 5 Cal. Unrep. 211, [42 Pac. 1068];
People v. Slaughter, 33 Cal. App. 365, [165 Pac. 44]; 7

Ency. of Evidence 96, 156.) Apart from the lack of foundation testimony, the question put to the impeaching witness called for the entire conversation, and under no theory whatever was the defense entitled to more than the variant statements.

Assignment No. 17 was that the court erred in the ruling contained in the following quotation from the record: "Q. Where did you meet Mr. Seymour [special prosecutor] before you went to the district attorney's office? A. I didn't see Mr. Seymour before, I just came from Hesperia. Q. Did he approach you first? Mr. Simon: Objected to as incompetent, irrelevant, and immaterial. The Court: I will sustain the objection." This was an obviously proper ruling, for the reason that the question did not show its materiality, nor does the record disclose that the question was reframed or any statement made to meet the defect. [19] Where the question does not show on its face whether or not it is material, the questioner, in order to reserve an exception, must formally reframe the question so that its materiality is apparent. (*Snowball* v. *Snowball*, 164 Cal. 476, [129 Pac. 784]; 9 Ency of Evidence, 170.) Upon the same reasoning assignment No. 19 is disposed of.

[20] Assignment No. 18 has reference to the testimony of the wife of defendant that he kept a pistol at the head of his bed. It is conceded by respondent that "the evidence complained of was too remote, probably, to be material." With this we agree and with the contention that it was not prejudicial, for the defendant admitted that he did so keep a pistol but that it belonged to his partner, and this statement was apparently not questioned by the district attorney.

The final contention of appellant is that the court erred in admitting the testimony of the wife of the defendant against her husband. This involves two questions: Was the wife a competent witness at all, and, if she was, were the objections to questions on the general ground that they were "incompetent, irrelevant, and immaterial" sufficient to raise the question of the competency of the *witness* under section 1322 of the Penal Code. That section reads: "Neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties, except with the consent of both. . . . "

[21]  The rule of the common law that the wife was absolutely incompetent to testify against her husband has been modified in this state so that either spouse may testify with the consent of the other.  (Pen. Code, sec. 1322; Code Civ. Proc., sec. 1881.)   This consent may be express or implied. The general rule is thus stated in 40 Cyc. 2228: "A spouse who is present in court when the other spouse is offered as a witness and testifies, and who does not object, is presumed to have consented . . . ," citing *Benson* v. *Morgan,* 50 Mich. 77, [14 N. W. 705].  In the case at bar the wife was called by the prosecution and sworn as a witness in the presence of her husband with his knowledge and apparent acquiescence.

The first objection was made to the question, "Why did you stop living with Rulia Singh?" on the grounds of incompetency, irrelevancy, and immateriality.  The witness had already testified that she was the wife of the defendant, that she had not lived with him since May, 1918, and that she knew the deceased in his lifetime.  The same objection was repeatedly interposed to various questions subsequently put to the witness during her direct examination, but all the objections were addressed to the *testimony* and not to the *competency* of the witness.  The appellant, however, claims that these objections were sufficient to present to the court the question of the competency of the wife to testify. [22]  With this we do not agree.

No cases in this jurisdiction are cited by appellant which establish any exception to the rule above quoted, but we are referred to *State* v. *McGrath,* 35 Or. 109, [57 Pac. 321]. That case is clearly distinguishable on its facts.  There the defendant was on trial for murder.  He testified to the effect that the deceased had been criminally intimate with his (defendant's) wife.  The appellate court held that it was error to admit the testimony of the wife, offered in rebuttal by the state, in reference to the matter, *against his objections and protest,* and that the defendant, by offering himself as a witness, could not be deemed to have consented to the examination of his wife.  Appellant also cites the case of *Humphrey* v. *Pope,* 1 Cal. App. 374, [82 Pac. 223].  In that case the wife was the plaintiff in the action while her husband was neither a party thereto nor, for all that appears, even present in court.  Over a general objection of

the defendant that the testimony was wholly incompetent, irrelevant, and immaterial, the wife was permitted to testify to certain communications made to her by her husband during marriage. The court states, and it appears the statement was not necessary to a decision of the case, since the wife's testimony was held incompetent as hearsay, that evidence as to communications between husband and wife, when offered by either spouse, is incompetent unless consent of the other spouse is shown, and concluded that the objection made was sufficient to enable the appellate court to consider the point of the wife's competency. In that case, the husband not being a party to the action and the wife not having been offered as a witness against him, no question of her general *competency* as a witness arose, the husband's consent could not be implied from a failure to object, and thus it was to be presumed he did not consent. Under such circumstances a general objection to the competency of the *question* was held sufficient. Appearing, as it does in the case at bar, that at no time during the trial did the appellant signify a revocation of his consent to his wife's testimony implied from his failure to object thereto, the question of her competency comes too late when raised for the first time on appeal. "The objection must have been made in the trial court when the witness was examined," where her incompetency was then known. (3 Corpus Juris, 828.) **[23]** It is well settled in this state that if objections to the competency of witnesses are not made in the trial court, they will not be considered on appeal. (*Curiac* v. *Packard,* 29 Cal. 194, 197; *Ah Tong* v. *Earle Fruit Co.,* 112 Cal. 679, [45 Pac. 7].) **[24]** If one spouse, a party to the action and present in court, relies upon the incompetency of the other to testify, the objection must be made at the time and on such grounds as to bring clearly before the court the question of the incompetency of the witness, or, if this is not done, the privilege will be deemed to have been waived.

Judgment and order affirmed.

Shaw, J., Wilbur, J., Lennon, J., Angellotti, C. J., Olney, J., and Kerrigan, J., *pro tem.,* concurred.

Rehearing denied.

All the Justices concurred.