[Crim. No. 1554. In Bank.—April 5, 1910.]

THE PEOPLE, Respondent, v. W. F. CORD, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—DYING DECLARATION OF DECEASED —SENSE OF IMPENDING DEATH—LOSS OF HOPE.—Upon a prosecution for murder, the dying declaration of the deceased, made under a

sense of impending death, with respect to the cause of his death, may be admitted in evidence. It is held that the evidence is clearly sufficient to warrant the conclusion that the declaration in question was given under a sense of impending death, and expressed loss of hope of recovery when the statement was made. This shows all that the statute requires to justify the admission of the declaration.

ID.—EFFECT OF STATEMENT NOT DESTROYED BY SUBSEQUENT REMARK.— The effect of the previous statement of the deceased that he saw "no hope of recovery," and entertained "no hope at all," was not destroyed or necessarily qualified by the remark after the statement, "We don't know anything about what the future has, but I have no hope of any recovery."

ID.—QUESTION OF HOPE ONE OF FACT FOR TRIAL COURT—SUFFICIENCY OF EVIDENCE.—Whether or not the deceased was without hope when he made the declaration was a question of fact to be determined in the court below. The evidence taken to show deceased was without hope of recovery was competent and legally sufficient to sustain the conclusion of the trial court that he was then without hope of recovery, and believed that death would soon take place.

ID.—PREVIOUS STATEMENT OF PHYSICIAN AS TO FATALITY OF WOUND NOT REQUIRED.—Although the evidence does not show that the physician had made any previous statement that the wound was fatal, yet there is no rule of law which makes such information a necessary prerequisite to the admission of a dying declaration. It is sufficient that the circumstances connected with the wound gave to the deceased reasonable cause of apprehension of fast approaching death.

ID.—SURVIVAL FOR TWO WEEKS.—The circumstance that deceased survived for nearly two weeks after being shot, and for a time he was able to move about before death occurred, cannot affect the legal sufficiency of his dying statement.

ID.—MEANING OF "DYING PERSON" IN CODE PROVISION.—Although the meaning of the phrase, "dying person," in subdivision 4 of section 1870 of the Code of Civil Procedure, has not heretofore been judicially declared, it does not mean that, in order to make his dying declaration admissible, he must be in the act of expiring or in his death struggle. The intention of the codifiers was to express with brevity the previous rule on the admissibility of dying declarations, that it was not necessary that he should die immediately or within any specified time, in order to give the declaration probative force, if made without hope of recovery and in belief of approaching death.

ID.—ONE FATALLY WOUNDED DEEMED A "DYING PERSON"—FALSE HOPE OF RECOVERY NOT AFFECTING DYING DECLARATION.—Where a person, as in this case, has been fatally wounded, and is in sore distress from the wound, and believes that he will not recover, and is soon about to die, his statement as to the cause of the wound is admissible; and since, in fact, there could be no recovery, though death did not immediately result from the fatal wound for a period of two weeks,

he must be deemed a "dying person" from the time he received such fatal wound until death resulted therefrom; and the mere fact that he subsequently revived for a time, and that he and others then began to entertain a false hope of recovery, could not affect the solemnity or veracity of his dying statement.

ID.—SEPARATION OF JURORS DURING RECESS—VISIT OF JUROR TO SICK WIFE WITH OFFICER—JURORS INACCESSIBLE.—An objection to the separation of the jurors during recess, is not tenable, where it appears that one juror visited his sick wife in charge of an officer, and that all of the jurors were kept inaccessible to approach about the case.

ID.—NECESSARY TEMPORARY SEPARATION PENDING VERDICT—FIRE IN HOTEL PENDING MEAL—ABSENCE OF PREJUDICE.—Where the jurors while at a meal in a hotel in charge of an officer pending verdict, were necessarily temporarily separated owing to a fire on the roof of the hotel, but remained in view of the officer, and it affirmatively appeared that none of them were spoken to about the case, such separation was without prejudice to the defendant, and after verdict for manslaughter, the view of the separation most favorable to the prosecution must be taken in support of the verdict.

ID.—IMPROPER IMPEACHING EVIDENCE—GENERAL REPUTATION NOT SHOWN —STATEMENTS CONNECTED WITH TRIAL IN FORMER RESIDENCE—STRIKING OUT.—The testimony of a witness called to impeach the dying statement of the deceased made in Tulare County, where he had lived more than twenty years before his death, not based on any general reputation, that when he formerly lived in Santa Clara County, from statements made by three persons connected with a trial therein, his reputation was bad therein for truth, honesty, and integrity, was properly stricken out by the trial court, without any abuse of its discretion.

ID.—MODE OF IMPEACHMENT UNDER CODE—BAD "GENERAL REPUTATION." —A witness may not be impeached by proof of bad reputation for truth, unless he is held in such bad repute generally in the community in which he lives or is generally known. It is the "general reputation" that is to be proven, under section 2051 of the Code of Civil Procedure.

ID.—GENERAL REPUTATION IN PLACE OF FORMER RESIDENCE—QUESTION OF REMOTENESS FOR TRIAL COURT.—It is a question for the trial court to determine whether or not general reputation in a place of former residence is too remote in point of time to be allowed in evidence.

ID.—EXPERT EVIDENCE—HYPOTHETICAL OPINION AS TO CAUSE OF DEATH. —WOUND THE PROXIMATE CAUSE.—The court properly refused to allow a hypothetical question to be put to a physician to elicit his opinion that the immediate cause of the death of the deceased might have been the reopening of the wound by reason of some movement or exertion then made by him. The wound inflicted by the defendant would nevertheless be the proximate cause of the death, the uncontradicted evidence being that it was necessarily fatal; and the

opinion given as asked for would have been immaterial to any issue in the case.

ID.—EVIDENCE—BAD REPUTATION OF DECEASED FOR PEACE AND QUIET—IMPROPER RE-EXAMINATION—TEMPER WHEN ANGRY.—Where a witness had testified as to the bad reputation of the deceased for peace and quiet, he cannot be asked on re-examination in regard to his temper when he got angry, where there was nothing in the cross-examination calling for such testimony as an explanation. It was not competent as original testimony for the defendant.

APPEAL from a judgment of the Superior Court of Tulare County and from an order denying a new trial. W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

J. A. Allen, George G. Murry, and E. O. Miller, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

SHAW, J.—The defendant was tried upon a charge of murder of the first degree and was convicted of manslaughter. He appeals from the judgment and from an order denying his motion for a new trial.

The information charged the defendant with the murder of one John P. Pawley on the twenty-seventh day of January, 1908. It appeared that on that day he shot Pawley with a pistol, inflicting a wound from which Pawley died on February 17, 1908. Upon the trial a statement purporting to be a dying declaration of Pawley was admitted in evidence over the objection of the defendant. It is insisted that this ruling was erroneous for two reasons: 1. Because it was not shown that it was made by Pawley in the belief that he was about to die and under a sense of impending death; and 2. That at the time he made the statement Pawley was not "a dying person" within the meaning of that term in the statute providing for the admission of dying declarations (Code Civ. Proc., sec. 1870, subd. 4).

1. The section declares that in criminal actions the declaration of a dying person, made under a sense of impending death, with respect to the cause of his death, may be admitted in evi-

dence. The evidence is clearly sufficient to warrant the conclusion that the statement in question was given under a sense of impending death. It was made on January 28th, the day after the deceased received the fatal wound. He was then at his home, lying in bed and weak from loss of blood caused by the wound. Before making the statement he was informed that he would be asked to relate the facts about the shooting, and that it was necessary first to ask whether or not he thought there was any hope that he would get well. To this he answered: "I don't see no hope in the world." Being then asked, "That is the way you feel?" he said, "I don't entertain no hope at all." After his statement was made and taken down in shorthand, the following conversation occurred between him and the district attorney: "Now, this statement you are making to us, you are making it in view of impending death?" "Yes, sir." "And without any hope of recovery?" "Yes, sir. We don't know anything about what the future has, but I have no hope of any recovery." "That is the way you feel?" "Yes, sir; the condition of my mind." "And it is in that frame of mind that you are making this?" "In that frame of mind I am making this statement."

This shows all that the statute requires on this point. His belief that he could not recover from the wound, and his understanding that he was giving the account of the manner in which he received it, under a solemn sense of approaching death, was clearly indicated by his testimony. The effect of the statements by him as to his mental condition was not destroyed by his remark, after giving the statement, that "We don't know what the future has." This was a mere statement of an obvious conclusion which any person might make under any circumstances. It did not necessarily indicate that he thereby meant to qualify the statement that he was without hope of recovery. Whether or not he was without such hope was a question of fact to be determined in the court below. The evidence taken was competent for that purpose and is legally sufficient to sustain the conclusion that he was without hope of recovery and believed that death would soon take place. The evidence does not show that his physician had previously told him that the wound was fatal, but we know of no rule of law which makes such information a necessary prerequisite to the admission of a dying statement. He had been

shot in the breast at the junction of the third rib with the breast bone. He was thereby rendered unconscious for a considerable time and had lost a great deal of blood, the pleural cavity being found full of blood a few days afterwards; he was affected so that he could not breathe easily, except by lying in a half-reclining position; and he was suffering from pain. All these circumstances would give reasonable cause for grave apprehension of fast approaching death in the mind of a person so situated.

2. The claim that he was not, at that time, a dying person is founded on the fact that he lived for more than two weeks after making the statement and that, until a few hours before his death, he was thought to be recovering. In this respect the case is remarkable, considering the nature of his wound as shown by the autopsy made after his death. It was found that the bullet, a 38 caliber, had pierced the cartilage of the third rib and the edge of the breast bone and had entered the arch of the aorta, and had then fallen down into the aorta and had rested upon one of the semilunar valves opening from the left ventricle of the heart. If the puncture of the aorta where the bullet had entered had remained open the man would have died from arterial hemorrhage within a few minutes after he was shot. In some manner unknown it became closed and so remained until the time of his death, when for some reason it again opened, causing almost immediate death from the bleeding. It was the opinion of the physicians that immediately after the shooting the orifice was by some means closed long enough to allow the formation of an organized blood clot over it, which kept it closed until the blood clot had become somewhat disorganized, and that then the puncture opened, letting the blood flow and causing death at once. That the bullet had been, in the mean time, resting within the aorta upon the semilunar valve, was shown by the fact that there was a thickening of the valve at the place where it was found, caused by inflammation which must have been produced by irritation continuing for a considerable period of time. A blood clot was found at the place where the aorta had been pierced by the bullet. Some three or four days after he was shot he was taken to a hospital to have performed upon him the operation of drawing off the blood which had entered the pleural cavity. Nearly two quarts of blood were at that time drawn off by

means of a needle. He was in the hospital thereafter until the day before his death, a period of two weeks. During that time he had recovered sufficiently to go out riding several times and to walk upstairs with assistance. When he left the hospital the bullet had not been located and the physicians, being ignorant of its situation, then expected that he would recover.

We have no decisions in this state declaring the meaning of the phrase "a dying person," in section 1870 of the Code of Civil Procedure. It does not mean that in order to make such declaration admissible the person making it must be at the time in the act of expiring or in the final death struggle. It is seldom that a human being in that stage of dissolution is capable of making any statement whatsoever in the nature of a connected or reliable narrative or account of a past transaction. To admit such declarations only when made by a person in that condition would practically exclude them altogether, or render them useless for any purpose. We think the intention of the codifiers was to express, as clearly and comprehensively as was compatible with the necessary brevity, the rule on the subject of the admissibility of dying declarations as it had previously existed. By this rule it was not necessary that the person should be at the time in the throes of death, or that he should die immediately, or within any specified time thereafter, in order to give the declaration probative force. (1 Greenleaf on Evidence, sec. 158; Roscoe on Criminal Evidence, *p. 37, 8th ed., 61; 21 Cyc. 978; *State* v. *Nash,* 7 Iowa, 381; *Hall* v. *Commonwealth,* 89 Va. 177, [15 S. E. 517]; *Swisher* v. *Commonwealth,* 26 Gratt. 963, 971, [21 Am. Dec. 330]; *State* v. *Reed,* 53 Kan. 773, [42 Am. St. Rep. 322, 37 Pac. 174]; *State* v. *Kilgore,* 70 Mo. 553; *State* v. *Tilghman,* 33 N. C. 513.) It was considered that the belief that a fatal wound had been received and that death was about to ensue therefrom would deter such person from uttering a willful untruth about its cause, if not as effectively as would the sanction of an oath reinforced by the earthly penalty for its violation, at least sufficiently to justify its admission as evidence of the facts recounted. Where a person has been fatally wounded, is in sore distress therefrom, and believes that he will not recover and is soon about to die, his statement made in this belief relating to the cause of his injury is admissible, if it appears that he sub-

sequently died from the direct effects of the wound, although he may have revived after making the statement or may have lived a considerable time thereafter, and may have again begun to hope for recovery. Such person is to be deemed "a dying person" within the meaning of the statute from the time the wound is received until death results from the injury, and his statement during that period made in view of death and with the belief that it is near at hand, may be proven to establish the cause of death. In the present case the evidence shows that this wound was necessarily fatal and that his dissolution therefrom was in progress continuously from the beginning to the close. The remarkable thing is that he lived so long in such a condition. He was never on the road to recovery, as appellant contends, but was constantly on the brink of death from a recurrence of hemorrhage. He believed his death imminent at the time he made the statement. The fact that he and others may have afterwards entertained a false hope of recovery could not have affected the solemnity or veracity of his statement, nor have made him other than a dying person, in the sense of the statute, at the time the statement was made.

3. It is contended that the jury was allowed to separate, after having been put in charge of an officer, during the trial and before the case was finally submitted to them. One juror, whose home was in Visalia, where the trial occurred, was allowed to go in charge of a deputy sheriff to visit his wife, who was sick. This occurred during a recess of the trial, the juror was separated from the other jurors less than an hour, and the defendant's attorney had consented to the visit. It was shown that while he was away nothing was said to him about the case and that the other jurors were locked up and were inaccessible to any person. There is no merit in the objection.

4. It is also claimed that there was a separation of the jury after they were charged and before the verdict was returned. The jury was sent out to consider their verdict on June 2d and returned the verdict in the afternoon of the next day. They were taken to the Elder House on June 3d for luncheon and were there seated at a table with the officer in charge. No one else was at that table. While they were eating luncheon a fire broke out in a barn one block distant from the hotel.

As would be expected, the evidence as to what then ensued is conflicting. The court below decided against the defendant and therefore we must accept the evidence unfavorable to him as true. One of the jurors, Mr. Cottle, was a brother of the landlady. When the news of the fire was first heard by the jury they remained at the table a few minutes. Then the landlady told them that as the roof of the hotel was on fire the waiters could not continue to serve them, and she asked Cottle to get the hose, which was in the kitchen, the door from the kitchen into the dining-room being wide open. Cottle did so and carried the hose from the kitchen through the dining-room to the sidewalk in front. All this was in the plain view and immediate presence of the other jurors and the officer, with the exception of an instant while he was in the kitchen. As he returned the jurors all arose and walked with him as he came from the kitchen into the dining-room and on out to the sidewalk, except one juror, Mr. Kellenberg. Kellenberg asked the landlady if he could assist her, and she asked him to run upstairs and assist persons there. As the other jurors started out to the sidewalk Kellenberg ran up stairs and through a bedroom or hallway, out in front upon a balcony or porch over the sidewalk. He did this so quickly that when the officer reached the street with the other jurors Kellenberg was already on the porch, holding a ladder, while another person carried a bucket of water up the ladder to the roof to extinguish the fire. Kellenberg then came down into the street and with several other jurors walked across to the opposite side of the street and remained there a few minutes, watching the fire at the barn. They were about sixty feet away from the others at that time, but all of them were in plain view of the officer. One of them, Ballou, took a bucket of water and put out a small fire on the sidewalk. While this was occurring another juror, Sellers, gave directions to an acquaintance on the street to take care of his (Sellers's) horse. No one spoke to either Kellenberg or Sellers about the case. The officer testified that he kept the jurors in view and within hearing, except as above stated, and as close together as he could under the circumstances, and that they did not talk to any one nor have any chance to do so. While the jurors were thus out in the street other persons were coming and going about in rather close proximity to them. It would, of course, be improbable that there would be any

talk about the case under these circumstances. Cottle was out
of sight but an instant in going from the open kitchen for the
hose, and as he was very quick about it, it is a reasonable in-
ference, if not a necessary conclusion, that he neither spoke
nor was spoken to, in that moment, upon any subject. Where
the jury has been permitted to separate while deliberating
upon a verdict, under such circumstances as to make it appear
that they might have been tampered with, a new trial should
be granted, unless there is affirmative proof upon behalf of the
people explaining the separation and showing that the defend-
ant was not prejudiced thereby. (*People* v. *Adams,* 143 Cal.
210, [101 Am. St. Rep. 92, 76 Pac. 954] ; *People* v. *Brannigan,*
21 Cal. 339; *People* v. *Symonds,* 22 Cal. 352.) If this burden
is met by the people a new trial should be denied. We think in
this case there was reasonably strong proof that the jury was
not tampered with and that defendant suffered no prejudice
from the confusion and slight separation growing out of the
alarm of fire. There was other evidence showing greater con-
fusion and a more complete separation, but, as before stated, we
must take the view most favorable to the prosecution in sup-
port of the decision of the trial court. There was no attempt
to show the slightest bad conduct on the part of any member
of the jury, or any effort by any person to approach or in-
fluence them in any way. The following cases support the con-
clusion that there was no conduct on the part of the jury pre-
judicial to the defendant. (*People* v. *Bemmerly,* 98 Cal. 301,
[33 Pac. 263] ; *People* v. *Sansome,* 98 Cal. 239, [33 Pac. 202] ;
*People* v. *Leary,* 105 Cal. 495, [39 Pac. 24] ; *People* v. *Bush,*
68 Cal. 627, [10 Pac. 169] ; *People* v. *Wheatley,* 88 Cal. 119,
[26 Pac. 95] ; *People* v. *Yut Ling,* 74 Cal. 570, [16 Pac.
489].)

5. The witness Anderson, for the defendant, testified that he
was well acquainted in a certain community in Santa Clara
County, where the deceased, Pawley, had formerly lived; that
he knew Pawley there; that he had been a deputy sheriff and
policeman there for twenty-seven years; that he knew Pawley's
reputation in that community at that time for truth, honesty,
and integrity, and that it was bad. This evidence was stricken .
out by the court. He did not testify that he knew the *general*
reputation of Pawley for truth, honesty, and integrity, and the
facts elicited in his cross-examination show that he knew noth-

ing of Pawley's reputation, except what he had heard from three police officers on one occasion during a trial before a justice of the peace more than twenty years before, in Santa Clara County, where Pawley then lived; that these officers were talking about Pawley's testimony at that trial, and that the witness, Anderson, had seen Pawley but twice in his life and that was more than twenty years before his death. It was also in evidence that for the last twenty years of his life Pawley had not lived in Santa Clara County, and had not done business there, but had lived in Tulare County, some two hundred miles from his former residence. A witness may not be impeached by proof of a bad reputation for truth unless he is held in such bad repute, generally, in the community in which he lives, or is generally known. It is the general reputation that is to be proven (Code Civ. Proc., sec. 2051). The ultimate fact to be established is his actual personal character, and it is considered that the general opinion of his character held by persons who know him is of probative value as evidence of his real character. Hence the witness to such reputation must, at least, be acquainted with the prevailing impression in the community, as disclosed by actions, conduct, or conversations relating to the character in issue, although it is not necessary that the witness testifying should know that the majority of the community have that impression. (16 Cyc., 1276, 1277.) The question as to what territory, and what people comprise the "community," especially in large cities, is not here involved. It is a question for the court to determine whether or not general reputation in a place of former residence is too remote in point of time to be allowed in evidence. (16 Cyc., 1277.) In the present case the deceased had not resided in Santa Clara County for more than twenty years before the shooting. It is obvious from these rules of law governing the subject that the court below, so far as appears, did not abuse its discretion in striking out the evidence of Anderson on the subject of the reputation of the deceased on motion of the district attorney.

6. The court properly refused to allow a hypothetical question to be put to a physician intended to elicit his opinion that the immediate cause of the death of Pawley might have been the reopening of the hole in the aorta by reason of some movement or exertion then made by him. The wound inflicted by

the defendant would nevertheless be the proximate cause of the death. The uncontradicted evidence was that it was necessarily fatal, and even if not so the proposed opinion would not have affected the proposition that Pawley suffered death at the hands of the defendant. If the opinion had been given as proposed it would have been immaterial to any issue in the case. Furthermore, the witness in answer to previous questions on cross-examination had stated that he hardly thought such a thing possible.

7. Another witness testified that Pawley's reputation for peace and quiet was bad. On re-direct examination the court refused to allow him to testify further in regard to Pawley's temper when he became angry. There had been nothing in the cross-examination calling for such testimony as an explanation, and it was not competent as original testimony for the defendant.

We do not consider it necessary to discuss the alleged errors in giving and refusing instructions. They were not, as defendant claims, of a character to mislead the jury, but were correct in law and were applicable to the case as submitted to the jury.

The judgment and order are affirmed.

Sloss, J., Lorigan, J., Angellotti, J., Henshaw, J., and Melvin, J., concurred.