[Crim. No. 9960.   In Bank.   Feb. 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM
ALBERT TAHL, Defendant and Appellant.

William Albert Tahl, in pro. per., Thomas W. Smith III, under appointment by the Supreme Court, and LeRue James Grim for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before a jury, on verdicts finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts*: Defendant pleaded guilty to (a) two counts of murder (Pen. Code, § 187), (b) attempt to commit robbery (Pen. Code, §§ 211, 664), (c) grand theft (Pen. Code, § 487, subd. 3), and (d) rape (Pen. Code, § 261, subd. 4).

It was stipulated by counsel, agreed to by defendant, and found by the trial court, that the degree of the offenses charged in counts I and II was murder in the first degree.

After a jury trial on the penalty phase of the case, punishment was fixed at death on each of the two counts of murder. Defendant was sentenced to death on each of those counts and to state prison for the term prescribed by law on the three remaining counts, execution of the sentences on the latter counts to be stayed pending completion of service of sentence on the first two counts, the stay then to become permanent. Defendant's trial began on February 1, 1966.

*Questions*: First. *Were the dying declarations of Victor and Bernice Bowen properly received in evidence?*

*Yes.* Defendant contends (a) that the hearsay declarations of Victor and Bernice Bowen were improperly received in evidence, because there was no foundation that the declarations were made with a sense of impending death, and (b) that, apart from the question of proper foundation, the fact that defendant's guilt had already been established by his plea rendered the declarations inadmissible at the penalty trial. These contentions are without merit.

(a) Pursuant to section 1870, subdivision 4, of the Code of Civil Procedure, "in criminal actions, the act or declaration of a dying person, made under a sense of impending death, respecting the cause of his death," is admissible in evidence as an exception to the general rule excluding hearsay statements from evidence.

■ The principal condition for the admission of a dying

declaration is that the declaration be made "under a sense of impending death." As a foundation for the admission of the declaration, this condition must be determined preliminarily by the trial court (*People* v. *Singh*, 182 Cal. 457, 476 [4] [188 P. 987]); and unless there has been an apparent abuse of discretion in that regard, the ruling of the trial court will not be disturbed on appeal (*People* v. *Pollock*, 31 Cal.App.2d 747, 754 [2] [89 P.2d 128]).

█ As stated in *People* v. *Gonzales*, 87 Cal.App.2d 867, 878 [6-7] [198 P.2d 81]: "To be admissible in evidence as dying declarations, the statements of the decedent must have been made at a time when he had abandoned all hope of life so that he believed that death inevitably must follow. This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind."

In the present case, Officer Bowling testified that as soon as he arrived at the Mission Bay Yacht Club, to which he had been summoned, he saw Victor Bowen lying on the steps of the caretaker's cottage. Officer Bowling observed that Mr. Bowen was holding his right side. There was blood on Mr. Bowen's right hand, and his intestines were protruding from a wound in his right side. Shortly thereafter, Officer Bowling questioned Mr. Bowen.

On further direct examination, Officer Bowling was asked, "And I would ask before going into that conversation [between Officer Bowling and Mr. Bowen], Officer, whether in the course of that conversation, there was any reference to his state of mind with respect to whether he was going to die or not."

Defendant objected to this question, "as first, calling for a conclusion of the officer; second, it calls for a hearsay statement and goes to an issue that is no longer an issue at this trial. We're on the penalty phase. I don't see where the exception to the hearsay rule that would allow such a declaration in applies in this situation."

The trial court overruled defendant's objection, noting that the district attorney was "entitled to lay a foundation, and . . . entitled to the testimony."

Defendant reiterated his objection, and after argument the objection was again overruled. Further objections by defense

counsel to evidence of dying declarations were overruled by the trial court.

Officer Bowling was then permitted to answer the pending question and did so in the affirmative. He related that when he first arrived at the scene, Mr. Bowen said, "We are dying, help us." He testified that there were several subsequent "references to the same subject matter." At this point, the trial court ruled that sufficient foundation had been laid for Mr. Bowen's dying declarations to be admitted in evidence.

Officer Bowling related the following conversation he had with Mr. Bowen: "I asked Mr. Bowen who did this. He said, 'Art Stahl.' I asked him again. He replied, 'Art Stahl.' And I said, 'Is he driving a car?' He said, 'A truck.' And I said, 'What type?' He said, 'A Ford pickup.' . . . When I finished questioning him he says, 'Please help us, we're dying. Check my wife.' "

Officer Bowling testified that after relaying the above information to police headquarters, he asked Mr. Bowen for a description of "Art Stahl" and that Mr. Bowen said, "Art Stahl is an Eskimo. He works for me."

Later, during the drive in the ambulance to the hospital, Officer Yaptangco asked Mr. Bowen who had shot him and what kind of vehicle that person was driving. Mr. Bowen replied that the person was "Art Tahl," and that he was driving a dark Ford "pickup." Asked whether defendant was "white," Mr. Bowen said, "No, he's an Alaskan." Officers Bowling and Yaptangco inquired, "Do you mean an Eskimo?" and Mr. Bowen replied, "Yes, an Eskimo. He works for me. Please hurry, we're dying. I'm breathing my last breath." Asked why defendant had shot him, Mr. Bowen said, "He wanted the keys to the safe."

Shortly after Officer Bowling's arrival at the yacht club, he heard a moaning sound coming from inside the cottage and, upon investigating, he found Bernice Bowen, Mr. Bowen's wife, lying on her back on a bed. There was a wound in her left side, from which her intestines were protruding. The sheet upon which she was lying was stained with blood.

During the drive to the hospital, which took only a few minutes, Mrs. Bowen continuously said, "Please hurry, I'm dying." Asked who had shot her, she replied, "Art Stahl." When Officer Yaptangco inquired how the name was spelled, she "said she thought it was S-t-a-h-l, or T-a-l-l, somewhere like that."

The Bowens were both "in obvious pain." Their condition

was so serious that the officers were unable to administer any emergency medical aid; there was "no quick action that . . . [they] could take." The Bowens were taken immediately to the emergency room of the hospital.

Operations were performed on each of the Bowens, lasting for approximately six hours. The two surgeons who performed the operations testified that the Bowens were near death at the time of their arrival at the hospital and that it was a miracle they survived for several days, as they did.

■ The above evidence was clearly sufficient to support the trial court's finding that the declarations of Victor and Bernice Bowen were made with a sense of impending death. (See *People* v. *Hoffman,* 195 Cal. 295, 306-308 [232 P. 974]; *People* v. *Cord,* 157 Cal. 562, 566 [108 P. 511].)

■ It was the Bowens' belief that they were about to die that was significant in determining whether their statements were made with a sense of impending death. That they lingered on for several days before dying was immaterial in this regard. (*People* v. *Cord, supra,* 157 Cal. 562, 566-567.)

Defendant emphasizes that the Bowens knew they were being taken to the hospital and that they both requested that the officers "please hurry." Defendant contends that this phrase indicated that the Bowens had hopes of recovery and that their statements were therefore not made with a sense of impending death.

The request, "Please hurry," was, under the circumstances, no more than a plea by each spouse that death or a pain-killing drug mercifully relieve both of them from the unbearable pain which they were suffering and that their remaining hours be made as comfortable as possible.

In *People* v. *Cord, supra,* 157 Cal. 562, 566, it was stated: "The effect of the statements by [the dying victim] as to his mental condition was not destroyed by his remark, after giving the statement, that 'We don't know what the future has.' This was a mere statement of an obvious conclusion which any person might make under any circumstances. It did not necessarily indicate that he thereby meant to qualify the statement that he was without hope of recovery."

(b) As indicated above, defendant contends that the fact that his guilt had already been established by his plea rendered the dying declarations inadmissible at the penalty trial.

Section 190.1 of the Penal Code provides, in part: "Evidence may be presented at the further proceedings on the

issue of penalty, of the circumstances surrounding the crime . . . and of any facts in aggravation or mitigation of the penalty.''

In *People* v. *Jones,* 52 Cal.2d 636, 647 [4] [343 P.2d 577], we held, with respect to section 190.1: ''It would appear that the new section embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed. In such cases wide leeway in the admission of evidence is permitted. [Citations.] If there are any limitations on the admission of such evidence, it is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty. That is this case.'' (See also *People* v. *Terry,* 61 Cal.2d 137, 145-147 [4a] [37 Cal.Rptr. 605, 390 P.2d 381]; *People* v. *Glatman,* 52 Cal.2d 283, 286 [2] [340 P.2d 8].)

In the present case, evidence of the dying declarations would clearly have been admissible at a trial on the guilt issue and hence was properly admitted at the penalty phase of the trial.

Second. *Did the trial court prejudicially err in failing to instruct the jury at the penalty phase that they were to determine whether the dying declarations were made without hope of recovery?*

*No.* Defendant contends that the trial court erred in failing to instruct the jury that they were to determine whether the Bowens were without hope of recovery at the time they made their declarations, urging that the following rule was applicable: ''If the jury is not convinced beyond a reasonable doubt that the declarant was *in extremis* and believed at the time that he was, they must, in arriving at their verdict, disregard such declarations. But if, on the other hand, the jury are satisfied beyond a reasonable doubt that the declarant acted under a sense of impending death, they must then determine what facts, if any, are established by his declarations and apply them accordingly.'' (*People* v. *Singh, supra,* 182 Cal. 457, 476 [5].)

Defendant failed to request such an instruction, but contends that it was error for the trial court to fail to give the instruction on its own motion.

Assuming, without deciding, that the trial court's failure to give the instruction constituted error, it was not prejudicial error under the circumstances of this case.

In the first place, the uncontradicted evidence established that each of the Bowens had suffered large wounds, from which their intestines were protruding, and that they believed they were "dying" and were "breathing [their] last breath."

In addition, the declarations consisted almost entirely of evidence that defendant was the Bowens' assailant and that the attacks were committed in the course of a robbery attempt. Evidence of these facts, however, was established by defendant's pleas of guilty to counts one, two, and three.

It should be noted that testimony by the officers with respect to the Bowens' large, gaping wounds and to the fact that it was obvious from their physical condition and their moans that they were in great pain constituted direct evidence and was not part of the dying declarations.

Under the circumstances, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the alleged error, and reversal is therefore not required. (Cal. Const., art. VI, § 13. █)

Third. *Was it error for the trial court to deny defendant's motion to exclude the press from the courtroom?*

*No.* Defendant contends that the trial court erred in denying his motion to exclude the press from the courtroom and deny the press access to him during the trial.

At the outset of the trial, in chambers, defendant made the following motion: "I wish to move that the Court deny the reporters access to the defendant, either during the trial or at any recess before the trial or after the trial. I base this on the fact that the publicity will be harmful to the defendant. It will give information to the prospective jury panel that should not be given to them. The further publicity, added to the publicity that's already been aroused by this case, is harmful to the defendant, and he could not get a fair trial in this county because of the publicity.

"And I add to this ground the fact that I have been advised that in the San Diego paper on Sunday there was an article that discussed this trial and reported the fact that there is a crime of murder, with a body mutilation, alleged to have been committed by this defendant in Texas. I think that this material is inflammatory. I don't see how the man can get a fair and impartial trial when these matters have been publicly exposed in a newspaper of general circulation—by that I mean a daily newspaper published in the county for general readership, and not a legal newspaper.

"I would ask the Court to exclude the reporters from the courtroom and deny them access to the defendant during the proceedings of this trial."

In reply, the district attorney requested that the trial court throughout the trial instruct the jury that they were not to read any newspaper articles concerning the case and not to view television or any other news media with respect to the case. The district attorney added that he thought the *voir dire* examination of the jurors would disclose their prior knowledge of the case.

The court thereupon ruled: "I think, Mr. Smith [defendant's counsel], that with the proper *voir dire* and instructions of the Court that we can insure that the defendant will have a fair trial without the exclusion of the press, and I am of the feeling that there is a right on the part of the people to know what is going on in the courts, as well as the right of the defendant to have a fair trial, and I think that we can see that the defendant has a fair trial without the exclusion of the press in this case, as well as all others that I've presided over, so far at least. And so the motion to exclude the press is denied."

█ The record discloses no motion by defendant for a change of venue, nor any further motion to exclude the press from the courtroom.

After the first prospective jurors, four of whom were ultimately selected as jurors in the present case, were seated in the jury box, the following took place: "THE COURT: Anything that you've read or heard about this case that has influenced you to the point you don't think you could be a fair and impartial juror in this case? (Various of the prospective jurors shook their heads in the negative.) THE COURT: Do any of you feel that you've read anything or that you've made up your mind on the case, or know anything about the case that you feel that you couldn't be a fair and impartial juror in this case? (Various of the prospective jurors shook their heads in a negative manner.)"

During *voir dire* examination of the prospective jurors, all but three of the persons who were ultimately chosen as jurors were asked whether they had heard anything about the case from the various news media. Although some had heard something about the case, none of those nine jurors (including the foreman) felt that he would be influenced in his deliberations by what he had previously heard.

The three other persons ultimately chosen as jurors were

not specifically examined by defendant as to whether their deliberations would be affected by what they had heard or seen in the news media, but they were asked whether they had heard the questioning of the other prospective jurors and whether anything would prevent their being fair and impartial jurors. Each of the three indicated that he had heard the questioning and that he could be fair and impartial.

The *voir dire* examination of the jurors indicates that those chosen as jurors were not influenced in their deliberations by whatever appeared in the news media. The fact that numerous prospective jurors, as well as those who were chosen as jurors, did not have strong recollections of the news media's coverage of the case also demonstrates the unlikelihood of there having been undue publicity or inflammatory reporting of the case by the press.

After the trial began, the jury was instructed generally not to form any opinion on the case until it was submitted to them, and they were instructed specifically on several occasions not to read any newspaper articles or listen to any radio or television broadcasts relating to the case.

The record contains no evidence of prejudicial pretrial publicity. At the time of his motion to exclude the press, all that defendant was able to point out to the court was that he had "been advised that in the San Diego paper on Sunday there was an article that discussed this trial and reported the fact that there is a crime of murder, with a body mutilation, alleged to have been committed by this defendant in Texas." Even if this unsubstantiated allegation is taken as true, there is no indication that such an account in the newspaper was read by any of the jurors or that the account prejudiced defendant. Any prejudice seems unlikely in view of the fact that subsequent testimony properly described the Texas incident in great detail.

Neither at the trial nor on appeal has defendant made a showing sufficient to demonstrate that pretrial publicity prevented his having a fair trial. (Cf. *Sheppard* v. *Maxwell*, 384 U.S. 333, 350-355 [16 L.Ed.2d 600, 86 S.Ct. 1507]; *People* v. *Duncan*, 53 Cal.2d 803, 810-816 [3 Cal.Rptr. 351, 350 P.2d 103], cert. granted, 363 U.S. 840 [4 L.Ed.2d 1725, 80 S.Ct. 1639], appeal dismissed, 366 U.S. 417 [6 L.Ed.2d 380, 81 S.Ct. 1355], because "the totality of circumstances disclosed fails to support the substantial due process issues tendered in the petitions for certiorari.")

It would have been clearly within the discretion of the trial

court to deny a change of venue in the present case. (See *People* v. *Duncan, supra,* 53 Cal.2d 803, 812.)

The record does not show whether there was any crowding of the courtroom by representatives of the various news media. (Cf. *Estes* v. *Texas,* 381 U.S. 532, 535-537 [14 L.Ed.2d 543, 85 S.Ct. 628]; *Sheppard* v. *Maxwell, supra,* 384 U.S. 333, 357-363.) It must therefore be presumed that the trial court acted within its discretion in denying defendant's motion to exclude the press from the courtroom.

At the time of the trial, rule 980 of the California Rules of Court was in effect and barred photographing, recording for broadcasting, and broadcasting within the courtroom while the court was in session or during any recess. Presumably, the trial court acted in compliance with this rule. (Code Civ. Proc., § 1963, subds. 15, 33.)

The *voir dire* examination of the jurors and the procedures adopted by the trial court in admonishing the jury to disregard the news media's reporting of the trial effectively ensured that defendant's right to a fair trial was not violated by publicity before or during the trial. Defendant has failed to show that the trial court abused its discretion in attempting to conduct a trial which was fair, public, and protective of the rights of defendant, the press, and the public at large.

Fourth. *Did the trial court properly admit evidence of other crimes committed by defendant?*

*Yes.* In an unsolicited statement which defendant made to St. Louis police officers on November 5, 1965, he admitted robbing and killing the Bowens in San Diego and thereafter robbing and killing a man in Dallas, whose name he did not recall, and robbing and attempting to kill a Mr. Thomas in St. Louis.

A Dallas County medical examiner testified that on April 26, 1965, he performed an autopsy on the body of William Ward in Dallas; that Mr. Ward's death had been caused by a stab wound into his heart; and that there were innumerable other cuts and bruises on his body. Two detectives from the Dallas Police Department testified with respect to their investigation of the crime, indicating that the victim had been brutally cut, beaten, and robbed and that defendant's fingerprints had been found in the victim's room.

Mr. Bascom Minus, of Dallas, testified that he owned a labor pool; that Mr. Ward and defendant had been members of the pool; that on April 26, 1965, defendant, who had not reported for work that day, appeared and asked if the checks

were ready; and that when asked why he had not shown up for work, defendant said that he and Mr. Ward had drunk some bad whiskey and that Mr. Ward was at home in bed ill. Thereafter, apparently no one saw Mr. Ward alive.

A St. Louis police officer testified as to the details of the attempted killing of Mr. Thomas in St. Louis on November 5, 1965, the victim having been slashed across the abdomen from one side completely to the other and severely beaten. The officer testified that defendant admitted to him that he and Mr. Thomas were roommates and that he had robbed Mr. Thomas and tried to suffocate him but then changed his mind and merely tied him to the bed.

The People also presented evidence that about 5 a.m. on April 1, 1965, shortly after robbing and attacking the Bowens, defendant, through a ruse, gained entrance to the home of Diana Dawson, the stepdaughter of his brother, and raped her, threatening to kill her two-year-old son if she did not do as he told her, and that when defendant and his victim heard a radio broadcast indicating that an elderly couple at the yacht club where he was employed had been brutally attacked, defendant, protesting his innocence, fled in a stolen automobile.

Another woman testified that in August 1959 she had met defendant in a bar and thereafter accepted his offer to drive her home; that he drove her into an area where there were no houses and sought to rape her; that she was able to hide in some bushes, but he threatened to kill her if she did not come out; that he subsequently found her and raped her; that while they were returning to the city, she opened the door and put her leg out; that a police car happened to come by at that time and pursued them; that defendant rammed the police car several times, and he and the police officer exchanged shots; and that she thereafter told the police what had taken place.

Albert Ackert, a member of the San Diego Police Department, testified that in August 1959 his attention was attracted to a vehicle from which a woman's leg was protruding; that he gave chase; that the driver accelerated his speed to between 70 and 80 miles an hour; that the driver rammed into the right side of the police car two or three times, pushing it onto the center island of the highway; that thereafter he (Officer Ackert) fired four shots at the right rear tire of the other automobile; that at this time the driver slowed down and pulled over; that defendant was the person who was driving the other car; and that the car defendant was driving was a stolen automobile.

██ Defendant was charged in the present indictment with the rape of Diana Dawson and with car theft, and he pleaded guilty to such charges. The record does not show that he was charged with, or convicted of, the other crimes hereinabove enumerated. However, under our holding in *People* v. *Ketchel,* 59 Cal.2d 503, 542 [30 Cal.Rptr. 538, 381 P.2d 394], this fact is immaterial as long as the evidence was relevant on the issue of punishment.

The fact that a defendant who is charged with first degree murder thereafter killed or attempted to kill another person is relevant to show that his state of mind was such that he was not revulsed by the prior killing but was willing to kill again. (*People* v. *Bentley,* 58 Cal.2d 458, 461 [24 Cal.Rptr. 685, 374 P.2d 645].)

Accordingly, the evidence on the killing in Dallas, the attempted killing in St. Louis, and the threat made to Diana Dawson to kill her son was clearly admissible.

Since the evidence shows that defendant's raping Mrs. Dawson and fleeing in a stolen automobile occurred almost immediately after he robbed and viciously attacked the Bowens, his behavior on the day in question may be said to constitute a criminal "spree."

██ Under the circumstances, evidence that on another occasion defendant indulged in massive violations of the law, such as he did in August 1959, when he stole an automobile, raped a woman, and then attempted to ram a police car with the car he was driving (such action constituting an assault with a deadly weapon) and shot at the police officer driving the car, is relevant on the issue of punishment as showing a "recurrent behavior," since the jury might conclude that the behavior would probably or possibly recur again if defendant should be given a life sentence and eventually be paroled. (See *People* v. *Terry, supra,* 61 Cal.2d 137, 143-145; *People* v. *Ketchel, supra,* 59 Cal.2d 503, 542 [48].)

██ It will be noted that the killing in Dallas and the attempted killing in St. Louis were admitted by defendant in his extrajudicial statement. However, the People introduced ample corroborating evidence with respect to the commission of those crimes. As a result, the rule that a defendant's extrajudicial admissions are inadmissible without other proof that the crimes had been committed (*People* v. *Hamilton,* 60 Cal.2d 105, 129 [18] [32 Cal.Rptr. 4, 383 P.2d 412]) is inapplicable.

Fifth. *Was it error for the trial court to admit evidence of*

*defendant's intention to go to Ohio and kill a person there?*

*No.* Defendant contends that the trial court erred in permitting Sergeant Goodman, of the St. Louis County Police Department, to testify that in defendant's unsolicited statement to the St. Louis police he admitted that he had been planning to leave St. Louis that night and go to Cleveland, Ohio, in order to kill a man there.

Defendant contends that the evidence of his statement was improperly received as a ''declaration of intent to show the state of mind of a person under the so called 'Hillmon' doctrine'' (*Mutual Life Insurance Co.* v. *Hillmon,* 145 U.S. 285 [36 L.Ed. 706, 12 S.Ct. 909]), since he never left for Cleveland or killed a man in that city.

At the trial, defendant made no objection to this testimony, and he is therefore precluded from claiming error in this respect on appeal. (*People* v. *Jones, supra,* 52 Cal.2d 636, 646 [3]; *People* v. *Glatman, supra,* 52 Cal.2d 283, 286 [1]; *People* v. *Feldkamp,* 51 Cal.2d 237, 241 [2, 3] [331 P.2d 632].)

In addition, defendant has misconstrued the basis upon which the statement was received in evidence. The admission of the statement was obviously not intended to demonstrate that a Cleveland killing had taken place, defendant's stated intention to kill a man in Cleveland having been thwarted by his arrest. Hence, there did not occur in the present case the error condemned in *People* v. *Hamilton, supra,* 60 Cal.2d 105, cited by defendant, namely, the proof of a prior offense by the introduction of the defendant's extrajudicial statements uncorroborated by any other evidence.

The basis for the admission of defendant's statement was the provision in section 190.1 of the Penal Code that on the issue of penalty the jury may consider evidence ''of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty.''

Defendant's intention to kill yet another person was relevant as to his state of mind regarding the three earlier killings. The statement showed that he apparently had no feelings of guilt or remorse. ''The jury was entitled to know that he was not revulsed by that killing but was willing to kill again.'' (*People* v. *Bentley, supra,* 58 Cal.2d 458, 461.)

In *People* v. *Corwin,* 52 Cal.2d 404 [340 P.2d 626], the sole witness presented by the People at the penalty phase of the trial was a deputy sheriff who, over the defendant's objection,

testified to a conversation he had with the defendant when taking him from the jail to the courtroom during the guilt phase of the trial. He testified that he asked the defendant "why did he kill the old lady,"[1] and that the defendant replied that "he didn't know why . . . but if he had it to do all over again, he would do the same thing . . . [and] he would also like to kill a couple of detectives . . . [and] his brother-in-law." (P. 406.)

This court, in affirming the judgment of conviction imposing the death penalty, held, at page 406 [1]: "Unquestionably, the broad language of section 190.1 sustains the propriety of the court's ruling admitting the conversation as relevant evidence on the trial of the penalty issue."

Sixth. *Did the trial court's failure to instruct the jury on the elements of the offenses not charged in the indictment constitute error?*

*No.* Although he requested no such instructions, defendant contends that the trial court erred in admitting evidence of the offenses hereinabove mentioned, which had not been charged in the indictment and had not been brought to trial, without instructing the jury as to the elements of those offenses.

In his closing argument, the prosecuting attorney characterized defendant as a man who had murdered three times, who had attempted the murder of a fourth person, who had stated his intention to kill a fifth person, who had committed three first degree robberies, various assaults with a deadly weapon, two rapes, and six automobile thefts, and who had threatened the life of a two-year-old child.

Defendant directs his argument to the prosecuting attorney's enumeration of the three first degree robberies, the assaults with a deadly weapon, the two rapes, and the six automobile thefts.

In *People* v. *Terry, supra,* 61 Cal.2d 137, we set forth the standard of proof required, at the penalty phase, on the issue of other offenses. Even though at the guilt phase of the trial the jury need be convinced only that it is more probable than not that the defendant committed other crimes before the jury may consider them, at the penalty phase the jury must be convinced beyond a reasonable doubt. (61 Cal.2d at p. 149, fn. 8; see also *People* v. *Polk,* 63 Cal.2d 443, 450-451 [11] [47

---

[1]The defendant had made three separate voluntary statements and confessions to various police officers and had voluntarily re-enacted the crime.

Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Jacobson,* 63 Cal.2d 319, 324, fn. 1 [46 Cal.Rptr. 515, 405 P.2d 555].)

In his opening argument, the prosecuting attorney informed the jury that they must be convinced beyond a reasonable doubt as to the truth of the other offenses.

The record indicates that both counsel jointly submitted and agreed to an instruction concerning the law of Texas on murder. It appears that no instructions pertaining directly to the other offenses were requested by either counsel. The prosecution further requested that instructions be given on circumstantial evidence and on the admissibility of admissions and confessions.

After instructions on the Texas law of murder, the following instruction was given: "Evidence of other crimes alleged to have been committed by the defendant may not be considered as evidence in aggravation unless proved beyond a reasonable doubt."

Thereafter, correct instructions on reasonable doubt and the admissibility of oral admissions and confessions were given.

The trial court then instructed the jury at great length on the standard of proof required with respect to the other offenses, as follows: "Where the case of the People rests substantially or entirely on circumstantial evidence, you are not permitted to find the defendant guilty of the other offenses unless the proved circumstances are not only consistent with the theory that the defendant is guilty, but cannot be reconciled with any other rational conclusion, and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt.

"Also, if the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence and reject the other which points to his guilt.

"If, on the other hand, one interpretation of the evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.

"I instruct you that you are not permitted on circumstantial evidence alone, or when the case of the People rests substantially on circumstantial evidence, to find the defendant guilty of the other offenses charged—other offenses—unless the proved circumstances not only are consistent with the

hypothesis that the defendant is guilty of the other offenses, but are irreconcilable with any other rational conclusion.

"When the case which has been made out by the People against the defendant rests entirely or chiefly on circumstantial evidence, before the jury may find the defendant guilty, basing its findings solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

■ If proved beyond a reasonable doubt, and if relevant on the issue of punishment, evidence of prior acts of misconduct by a defendant is admissible at the penalty trial as part of his "background and history" and as "facts in aggravation or mitigation of the penalty" (Pen. Code, § 190.1) even though he has never been prosecuted for them. (*People* v. *Ketchel, supra,* 59 Cal.2d 503, 542 [49].) There is no requirement that the jury determine at the penalty trial what technical crimes have been committed in order to consider such evidence.

■ Under the circumstances, defendant is not in a position to contend that the trial court should, on its own motion, have instructed the jury on the elements of the offenses.

There likewise is no merit in defendant's contention that the trial court erred in not instructing the jury, on its own motion, as to evidence of flight. Presumably, his contention has reference to his departure from Diana Dawson's house in San Diego on April 1, 1965.

■ The instruction on evidence of flight specified in section 1127c of the Penal Code appears from the language of that statute to be applicable only at the guilt phase of a trial.

Since no attempt was made by the prosecution to stress that defendant fled from San Diego under a consciousness of guilt, defendant's guilt of the 1965 San Diego offenses having already been established by plea, and since no instruction regarding flight was requested by defendant, it is clear that the trial court's failure to instruct the jury on this matter was not error.

Seventh. *Was evidence of the radio broadcasts and of Diana Dawson's conversation with defendant hearsay and improperly received in evidence?*

*No.* Defendant contends that the trial court erroneously admitted hearsay evidence of the contents of two radio broadcasts and of his conversation with one of the rape victims.

After defendant had raped Diana Dawson, he asked her for something to drink. She then walked over to the radio and turned it on. The 6 a.m. news came on. The broadcast included a report that two persons had been shot at the yacht club. Diana said, ''Oh, I wonder who that was.'' Defendant replied, ''That was Vic and his wife.'' The news broadcast then announced that ''the suspect was William Tahl.''

Diana said, ''Oh, no,'' and defendant stated, ''Diane, I didn't do it.'' Diana then suggested to defendant that he contact the police ''and tell them.'' Defendant said that he would do so, ran outside to a black 1957 Chevrolet, and left.

Richard Bradford, an investigator for the San Diego district attorney's office, testified that at 7:15 a.m. on April 1, 1965, he heard a radio news broadcast describing the shootings which had taken place earlier that morning at the Mission Bay Yacht Club. The broadcast did not mention the names of the victims.

The radio broadcasts and Diana's statements do not come within the accepted definition of hearsay.　█　''The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted.*'' (6 Wigmore, Evidence (3d ed. 1940) § 1766, p. 178, cited with approval in *People* v. *Bickley,* 57 Cal.2d 788, 795 [22 Cal.Rptr. 340, 372 P.2d 100].)

As said in *People* v. *Marsh,* 58 Cal.2d 732, 738 [6] [26 Cal.Rptr. 300, 376 P.2d 300] : ''Wigmore says, 'Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned.' (6 Wigmore, Evidence (3d ed. 1940) p. 235. See also 1 Wharton, Criminal Evidence (12th ed. 1955) p. 591, 'The question is merely whether they had any effect upon the mental state of the defendant.')

''California is in accord with this general rule.'' (See also *People* v. *Davis,* 62 Cal.2d 791, 798 [5] [44 Cal.Rptr. 454, 402 P.2d 142].)

█　The radio broadcasts and Diana's statements were not admitted as evidence of the truth of the matter asserted, but, rather, as background to defendant's utterances showing his state of mind.

The fact in controversy with respect to this evidence was defendant's state of mind upon hearing the broadcast, rather than the correctness of the broadcast.

Defendant's statement, "That was Vic and his wife," was significant in the context of Diana's testimony that the broadcast had mentioned the shootings at the yacht club but not the names of the victims, and that she had voiced aloud her curiosity as to "who that was." Defendant's statement in this context was a clear demonstration of his knowledge of the victims' identity at a time less than two hours after the offense and apparently prior to the time the victims' names were broadcast to the public.

When the broadcast continued and proceeded to name defendant as the suspect, and Diana said, "Oh, no," defendant demonstrated his consciousness of guilt by at first denying his involvement and then running out of the house and departing in a vehicle which apparently had been stolen.

Bradford's testimony as to the 7:15 a.m. news broadcast was intended simply to support Diana's testimony that radio broadcasts early that morning did not give the names of the victims and the inference that defendant's knowledge of the victims' identity was based upon his personal involvement in the offenses. Bradford's testimony was not offered as proof of the facts asserted in the broadcast, i.e., that defendant was the person who had shot the Bowens.

The relevance of Bradford's testimony was a matter within the discretion of the trial court, but the principles stated above with respect to the admissibility of Diana's testimony concerning the 6 a.m. news broadcast apply equally to Bradford's testimony.

The radio broadcasts in the present case were not basically different from the police broadcasts which this court and the Courts of Appeal of this state have on countless occasions permitted to be received in evidence for the sole purpose of showing the state of mind of the receiving officer, i.e., whether he had probable cause for an arrest.

The rulings of the trial court with respect to Diana's and Bradford's testimony were not in error.

Eighth. *Did the trial court err in admitting into evidence a weapon commonly known as a sap?*

*No.* Defendant contends that the trial court erroneously admitted into evidence certain prejudicial physical evidence, a weapon commonly known as a sap, without showing that defendant was connected with the weapon.

When the weapon was offered into evidence, defendant made the following objection: "Object to that, your Honor. No showing it's connected to the defendant. There were two

men in that apartment, as I understand it.''

The trial court withheld a ruling on defendant's objection, subsequently overruling the objection, and the weapon was received in evidence.

The weapon had been recovered by the St. Louis police at the scene of the attempted murder of Thomas, when they arrived at the apartment at 1:50 a.m. The weapon, which consisted of a wool sock in which there was a leather sack containing lead buckshot, was found on a bed in the apartment. The sap had broken open, and buckshot was on the bed and all over the floor.

In addition to the knife wound across the entire width of Thomas' stomach, there were marks on his face.

The above facts compel the inference that Thomas was in bed at the time his attacker assaulted him; that he was hit on the face with the sap and slashed on the stomach with a knife; and that during the course of the assault, the sap broke open and spilled the buckshot onto the bed and all over the floor.

Defendant's presence at the scene was sufficient to connect him with the weapon insofar as the admissibility, as opposed to the weight, of that evidence was concerned. But additional incriminating evidence connecting defendant with the weapon was supplied by defendant's statements to the investigating officers.

Defendant related that he was Thomas' roommate and that on the occasion in question he had ''beaten'' Thomas, slashed him with a knife, robbed him, and attempted to suffocate him.

Despite the absence of any direct evidence linking defendant with the sap, the above recited circumstantial evidence was ample to establish that defendant had employed the sap during the course of his attack on Thomas.

The applicable rule was set forth by this court in *People* v. *Riser,* 47 Cal.2d 566, 577 [7, 8] [305 P.2d 1]: ''When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his

possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons.'' (See also *People* v. *Ferdinand,* 194 Cal. 555, 563-564 [5, 6] [229 P. 341]; *People* v. *Peete,* 54 Cal.App. 333, 348-350 [202 P. 51].)

The admission of the sap in evidence was proper, as it tended to show that the sap was the weapon with which Thomas was beaten. The sap was not admitted merely for the purpose of showing that defendant was the type of person who carried deadly weapons. Defendant's statements to the police, in conjunction with the circumstantial evidence, clearly established his connection with the weapon.

Ninth. *Were the extrajudicial statements made by defendant to the St. Louis police, as he held them at gunpoint, a product of the accusatory stage?*

*No.* Some time after the St. Louis police arrived at Thomas' apartment, defendant entered the bathroom of the apartment. At the time, defendant was not under arrest, and the police did not know that he was wanted or had committed crimes in any other state.

After awhile, Sergeant Goodman went to contact defendant in the bathroom. When he opened the door, he observed defendant sitting on the toilet fully clothed. Sergeant Goodman stood in the doorway. He had not drawn his revolver. Defendant's hands were crossed inside his armpits and were hidden from the sergeant's view.

Sergeant Goodman asked defendant what he was doing, and defendant replied, ''Nothing.'' When the sergeant took a step toward defendant, defendant removed his right hand from underneath his coat and displayed a revolver in front of him. The sergeant did not reach for his own weapon. At the same time, defendant stated, ''Don't worry, I'm not going to kill you. I'm going to kill myself.'' Defendant placed the muzzle of the gun against his own chest and continued to talk to the sergeant.

Defendant at first asked for a pencil and a piece of paper, apparently for the purpose of making a written statement. However, when the police placed these objects on the floor in front of him, he declined to pick them up, saying that he was not going to let go of the gun.

At this point, Sergeant Goodman told defendant that he [Goodman] was going to move out of the bathroom. Defendant assented, and as the sergeant moved out, defendant began to speak.

The police did not use any force, threat of force, or promises of immunity or reward to persuade defendant to talk. Nor was defendant's action in continuing to talk the result of any interrogation; defendant was not asked any questions, and he was not under arrest.

Although Sergeant Goodman and the other uniformed officer were armed, as were the two plainclothes detectives who were present, none of them drew their weapons in defendant's presence until defendant had finished talking and had surrendered. Sergeant Goodman drew his weapon only after he had stepped into the bedroom outside of defendant's line of vision and had taken a position covering the entrance to the bathroom.

It was after Sergeant Goodman had stepped into the bedroom that defendant made the incriminating statements. The record does not indicate whether or not defendant had been advised of his constitutional rights prior to the making of these statements. Defendant had a gun in his hand during the entire time he was making the statements.

Defendant stated that before he killed himself, he wanted to give the police officers his correct name. He then gave his name, age, date of birth, place of birth, and former address. Immediately after giving this information, defendant said, ''Before I kill myself, I want to tell you about a few crimes.''

Defendant thereupon related that he had killed an elderly couple in San Diego and had robbed the man; had killed someone in Dallas with a knife; had beaten Thomas, slashed him with a knife, and attempted to suffocate him; and had been on his way to kill another person in Cleveland.

Approximately an hour after defendant had completed making the above statements, during which time Thomas and the police officers were trying to persuade him not to commit suicide, defendant unloaded the two guns, placed them and a five-inch pocket knife on the floor, came out of the bathroom, and surrendered.

Defendant's extrajudicial statements do not come within the exclusionary rules set forth in *Miranda* v. *Arizona,* 384 U.S 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (See *People* v. *Rollins, ante,* p. 681 [56 Cal. Rptr. 293, 423 P.2d 221].)

As stated by this court in the *Dorado* case:

"Only when the investigatory stage has become an accusatory one, that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements, does the doctrine of *Escobedo* apply and the confession given without the required warning or other clear evidence of waiver become inadmissible evidence. Moreover, an important consideration in determining whether the accusatory stage had thus been reached must be a careful concern that there be no interference with the legitimate police investigation of an unsolved crime." (62 Cal.2d at p. 354.)

▆▆▆▆ Likewise, in *Miranda* v. *Arizona, supra,* 384 U.S. 436, 478, it is stated: "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

By "custodial interrogation," the *Miranda* opinion meant "questioning after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (P. 444 of 384 U.S.)

▆▆▆▆ Defendant was not under arrest at the time he made his incriminating statements, nor can it be said that his freedom of action was inhibited as he held the officers at gunpoint. His statements were wholly volunteered; his narrative was not prompted by any questions.

At the trial, defendant examined Sergeant Goodman on *voir dire* as to the circumstances attending the making of the statements, but defendant did not object to their admission into evidence. In fact, on cross-examination, defendant elicited additional portions of the statements which had not been brought out by the prosecuting attorney on direct examination.

Under the circumstances, there was no error in the admission of defendant's extrajudicial statements.

■ Tenth. *Did the prosecuting attorney commit misconduct in his argument to the jury with respect to the death penalty?*

*No.* Defendant contends that the prosecuting attorney in his closing argument to the jury committed prejudicial misconduct in urging the jury "to use the death penalty as a form of justifiable homicide." It appears that the statements objected to were intended by the prosecutor to be in response to the argument of defense counsel that the jury should not deem itself compelled to return a verdict of death simply because defendant himself had taken human life.

A review of the argument indicates that under the circumstances the prosecutor did not go beyond the permissible limits of propriety and that his argument did not constitute misconduct.

Eleventh. *Were there any errors which affected the jury's deliberations at the penalty phase of the trial?*

*No.* Any additional errors asserted by defendant could not have affected the deliberations of the jury. The evidence overwhelmingly supported the jury's verdict, and defendant's sole witness, a psychiatrist, indicated that defendant was not insane and that he might kill again.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied April 5, 1967.